**WORCESTER et al. v. PURE TORPEDO CO.**

No. 8258.

Circuit Court of Appeals, Seventh Circuit.

Feb. 4, 1944.

Barnabas F. Sears, of Aurora, and Donald L. Thompson, of Chicago, Ill., and Charles Wham, of Centralia, Ill., for appellant.

Joseph Harrow, John Owen Wilkinson, and Corwin D. Querrey, all of Chicago, Ill., for appellees.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Plaintiffs brought this action to recover damages alleged to have been caused by the negligence of the defendant in shooting an oil well with nitroglycerine. The case has been tried twice and in both trials the issues and pleadings were the same. At the first trial the verdict was for the defendant. Upon appeal we reversed because of erroneous admission and exclusion of evidence, 7 Cir., 127 F.2d 945. There was a second trial before a jury and a verdict for the plaintiff. From judgment thereon defendant appeals.

On this appeal defendant contends chiefly that the trial court erred in failing to direct a verdict in its favor. It insists that plaintiffs were guilty of contributory negligence as a matter of law, and that there was no evidence tending to prove defendant guilty of negligence.

It is well settled law that cases are not to be lightly taken from the jury; that jurors are the recognized triers of questions of fact; and that negligence and what is the proximate cause of damages are questions of fact to be properly submitted to and determined by jurors from a consideration of all the attending facts and circumstances. On a motion for a directed verdict, it is the duty of the court to accept as true all the facts which the evidence tends to prove, and draw against the party making the motion all reasonable inferences most favorable to the party opposing the motion, and if the evidence is of such a character that reasonable men in an impartial exercise of their judgment may reach different conclusions, then the case should be submitted to the jury.

Defendant claims that plaintiffs, for the purpose of shooting the well, furnished defendant with a defective control head, and insists that the evidence shows conclusively that the explosion could not have occurred in the manner in which it did except for the defective control head. The argument is that had the control head functioned properly and remained closed after Mendenhall closed it, the oil and gas pressure would have been held at the top of the well, in which case the torpedo would have been allowed to descend to the bottom.

True, it is well settled that the person to whom an appliance is furnished is not responsible for its condition and in the absence of knowledge of any defect

in the appliance, cannot be held liable for damages caused by an accident arising out of a defective condition of such an appliance, Allegretti v. Murphy-Miles Oil Co., 363 Ill. 137, 1 N.E.2d 389. It is true that the control head, a safety device used to stop or control the flow of oil, was supplied by plaintiffs, but there was evidence that it closed tight against pressure and at no time opened by itself. There was nothing in any way wrong with it. It had been tested on the day of the accident and worked "like it should." It was relatively new, in good working order and condition, and had been used only a few days previous to June 6, 1940. Mendenhall testified that he checked the control valve for closing, and stated, "it was the easiest control head I had worked in twenty-seven years." Contributory negligence is nothing more or less than negligence on the part of the plaintiff, and the rules of law applicable to negligence of a defendant are applicable thereto. Village of Clayton v. Brooks, 150 Ill. 97, 37 N.E. 574. This being so, under this state of the record, the question of whether the plaintiffs were guilty of contributory negligence was a question of fact for the jury.

We now consider what we believe is the controlling question in the case—whether there was evidence tending to prove defendant guilty of negligence.

Defendant concedes that an oil well shooter may be liable for negligence, but it says, before there can be actionable negligence in this case, there must be a duty from the defendant to the plaintiffs, a violation of that duty, and resulting damages, and makes the point that it was required to possess ordinary skill and that its duty to plaintiffs was to give them the benefit of its best judgment. This it says it did, and contends that Mendenhall's conduct at most amounted to a mere error in judgment, for which it cannot be held liable.

In support of its contention defendant cites the well settled principles that persons practicing as physicians and surgeons are required to possess and practice their profession with ordinary skill, and proof that a good result was not obtained is, of itself, no proof of negligence, but that there must be affirmative proof of such negligence. The argument is that in our case the well suddenly and without warning started to gush from the control head and that Mendenhall did not know or suspect that the well would flow when it did.

The complaint alleged that the defendant agreed to shoot the oil well in a good workmanlike manner with the usual customary care, caution, and skill required by the dangers involved in the performance of such work; that before shooting the well,[1] it was defendant's duty to ascertain whether the well was in a safe condition for lowering a torpedo filled with nitroglycerine; that in the exercise of reasonable care and skill, the defendant knew or should have known that the well was in an unsafe condition for shooting; and that thus it was the duty of defendant, before lowering the torpedo, to clean out the well by swabbing,[2] or, if the swabbing process was insufficient to render the well safe, to kill the well[3] with water or oil.

On June 4, 1940, Mendenhall went to the well to solicit the job of shooting the well. He was given the job on June 6. Prior thereto Mendenhall had followed the profession or business of shooting oil wells for twenty-seven years, averaging 140 to 150 wells a year. The oil well in question was located in a high pressure gas field, the wells being described as "wild," and the wild, gassy character of the locality being generally known to oil men and others working in that vicinity. On June 6, the well had been drilled to a depth of 2277 feet and the casing set to a depth of 2255 feet. After the drilling had been finished, the well was cleaned and plugged, the casing was cemented, and the water was bailed out. About 100 feet from the well was a 100-barrel tank of water, with pipe and tap connection to the well, as well as a pit full of dead oil and a pipe connection from the pit to the well. There was also a hand pump swab and a bailer, and Mendenhall knew that in order to run the water or dead oil into the well, all one had to do was to open the valve. When Mendenhall, on June 6, came to the well, it emitted a steady flow of gas. From 6 a. m. until noon of that day, the well was swabbed

---

[1] Shooting a well. The operation of exploding a torpedo charged with nitroglycerine in the oil producing sands of an oil well.

[2] Swabbing. The operation of cleaning fluid out of an oil well by a suction device called a swab.

[3] Kill the well. A well is killed by filling the well with water or dead oil in order to weigh down the upward gas and oil pressure.

once every hour, but when Mendenhall arrived at about 1 p. m., the oil had risen to about 1700 or 1800 feet, the gas was escaping in short puffs, and the well was making a rumbling noise. To check the depth of the well and to make a test for possible obstructions, Mendenhall lowered a dummy shell filled with gravel. On its way down through the oil, the dummy bounced three times causing the line to which it was attached to stop for a moment, indicating that the dummy had struck a gas pocket. It took one hour to prepare the torpedo for shooting after the dummy was withdrawn from the well, and while the torpedo was being prepared, the puffing of gas and the rumbling noise increased. At the time Mendenhall was lowering the torpedo there were globules of oil coming out of the top of the well, but Mendenhall made no further effort to ascertain how much higher the oil had risen. The torpedo charged with ten quarts of nitroglycerine was lowered slowly and reached the oil at a depth of about 235 feet. Here Mendenhall set his brakes, walked to the well and closed the control head. Then he returned to his truck and found that his line was loose. At that time a six-inch ribbon of oil was flowing through the control head. He then said, "It is raising Hell down there," and yelled, "Everybody get the Hell out of here."

Mendenhall knew and testified that a flowing oil well created a dangerous condition for the lowering of a torpedo and that the torpedo might be forced to the top and explode. After Mendenhall advised those present to leave, he was asked, "Dale, don't you want to swab the well?" and he replied, "No, I think we can get it [the torpedo] in there and back before it starts flowing." Soon thereafter the oil began spurting and rose into the air 20 to 50 feet.

In addition to the evidence already related, there was testimony of expert witnesses having practical and theoretical experience in every phase of oil production and oil well drilling including the shooting of oil wells with nitroglycerine, tending to show that in the exercise of ordinary care, sound and safe practice required that Mendenhall should not have shot the well without killing or swabbing it before the torpedo was lowered. Under the facts and circumstances here proven, whether the defendant was guilty of negligence was a question for the jury.

It is also contended there was not sufficient proof that the negligence charged was the proximate cause of the damage.

True it is that defendant's liability could not be based upon surmise or conjecture, and in order for plaintiffs to recover, they must present probative facts from which the negligence and the causal relation could reasonably be inferred. But what is the proximate cause of an injury is ordinarily a question of fact, to be determined by the jury from a consideration of all the attending circumstances. It can only arise as a question of law when the facts are not only undisputed, but are also such that there can be no difference, in the judgment of reasonable men, as to the inferences to be drawn from them. Illinois C. R. R. v. Siler, 229 Ill. 390, 393, 82 N.E. 362, 15 L.R.A.,N.S., 819, 11 Ann.Cas. 368. If that requirement is met, the issue must be presented to the jury. No court is then justified in substituting its conclusions for those of the twelve jurors. Tennant v. Peoria and Pekin Union Ry. Co., 64 S.Ct. 409, decided January 17, 1944.

The instant case was submitted to the jury on the averment that after said loaded shell of nitroglycerine had been lowered to a depth of approximately 200 feet from the top of said oil well, the great upward pressure of the rising fluid and gas contained in said well forced said loaded torpedo upward, causing the nitroglycerine contained therein to explode prematurely and resulting in the damage and destruction to the property.

In discussing the rule as to what constitutes proximate cause, the court in the Siler case, supra, 229 Ill. 394, 82 N.E. 364, 15 L.R.A.,N.S., 819, 11 Ann.Cas. 368, said: "In order to make a negligent act the proximate cause of an injury it is not necessary that the particular injury, and the particular manner of its occurrence, could reasonably have been foreseen. * * * If the consequences follow in unbroken sequence from the wrong to the injury without an intervening efficient cause, it is sufficient if, at the time of the negligence, the wrongdoer might, by the exercise of ordinary care, have foreseen that some injury might result from his negligence." Applying the principles thus enunciated to the facts in our case, we are impelled to the conclusion that the complaint was sufficient to support the judgment and that there was evidence warrant-

ing the trial court in submitting the issues to the jury.

It is claimed that Roberts, Johnston, and Boatwright, plaintiffs' experts, were told that the well flowed, the line went slack, an explosion took place, and that the line went slack after the torpedo and time bomb were lowered 50 to 60 feet. The point is then made that the question of negligence must be determined upon the facts existing at and immediately prior to the time the alleged negligent act was committed, and since the questions assumed facts that were non-existent at the time the torpedo was lowered, error intervened.

■ Our examination of the record discloses that each of the witnesses was asked substantially the same question in which each was to assume that immediately after the torpedo was inserted in the well, the oil came out of the top of the well. The torpedo hit the oil at approximately fifty feet from the top. The objections to the question in the trial court were as to the form of the question, that the witness was not qualified, and that "that [was] a fact for the jury to determine." Nowhere in the record does it appear that the objections to the question were on the ground raised here. "If it was thought the basis for the hypothetical question was improper, the objection should have been pointed out so that the improper matter might have been eliminated. The special objection not having been made on the trial cannot be insisted upon here." Chicago Traction Co. v. Roberts, 229 Ill. 481, 485, 82 N.E. 401, 402. Moreover, as we have already observed, there was evidence that at the time the torpedo was being lowered, there were globules of oil coming out of the well.

■ Next, we are confronted with the contention that the conduct of the plaintiffs' counsel constituted prejudicial and reversible error.

In the course of the trial, plaintiffs, contending that proof of a customary method of doing an act by those who are frequently required to perform it is some evidence as to whether the method is or is not negligent, Fowler v. Chicago Railways Co., 285 Ill. 196, 201, 120 N.E. 635, sought to prove that in the locality in question wells were customarily killed before shooting. The court, however, upon objection by defendant, refused to permit the introduction of such evidence.

The record also discloses that plaintiffs, on the ground that it was part of the res gestae, sought to prove a declaration or statement made by Mendenhall following the explosion.

It appears that plaintiffs offered to prove, *not in the presence of the jury*, that while Mendenhall was 150 feet from the well, fifteen minutes after the explosion, he said: "I am sorry; it is all my fault. The damage will be taken care of by the Company." Objection to the question was sustained. Thereafter, while the witness Wright was being interrogated *in the presence of the jury*, he was asked if Mendenhall had told him [the witness] anything. The court sustained an objection to the question. Shortly thereafter, *out of the presence of the jury*, plaintiffs offered again to prove by one Price that Mendenhall had made the declaration, and again the court sustained the objection. Clearly no error can be predicated upon such a record, and in view of the verdict in favor of the plaintiffs, we need not decide whether the proffered testimony of the custom was competent, nor discuss whether the declaration was or was not a part of the res gestae.

■ Defendant also complains of plaintiffs' endeavor to elicit a conversation between Wilson, one of the plaintiffs, and Mendenhall, relative to the circumstances surrounding the rehiring of Mendenhall to do the shooting a second time.

It appears that although no question had been asked of Wilson on direct, cross or redirect examination, the subject matter of the second shooting was opened up by the *defendant* on the recross-examination of Wilson. It further appears that after defendant had shown the rehiring of Mendenhall to shoot the well a second time, Wilson, on redirect examination, in answer to a question that he relate the conversation, testified: "He [Mendenhall] asked me to let him shoot the well a second time so as to put himself in better light with his boss," and said "that his company would take care of the damages, anyhow." The court struck the latter part of the answer and instructed the jury to disregard it. Thereafter, in the recross-examination of Mendenhall, he was asked: "Didn't you tell Mr. Wilson that if he would let you shoot the well a second time, you would be put in better light with your boss and his damages would be taken care of by your Company?" The court sustained an

objection to the question, struck from the record all of the testimony relative to the second shooting, and, after severely rebuking counsel for plaintiffs, stated: "The testimony will be stricken from the record and the jury shall ignore it." We think it is clear that the jury was instructed not to consider that evidence, and under such circumstances, no reversible error is disclosed.

We have not discussed all the complaints and criticisms of counsel which are mentioned in the briefs under this contention. Space does not permit, nor would it serve any good purpose to discuss in detail the other instances claimed to be prejudicial. It is regrettable that counsel should have insisted on asking some of the questions after the court had sustained an objection thereto, and while we do not approve of his conduct, we think it will be enough to say that we have examined every criticism made, considered each in connection with the entire record, and are satisfied that the complaints did not affect substantial rights of the defendant, nor prevent the jury from exercising an impartial judgment on the merits. Accordingly, the judgment of the District Court will be affirmed.

It is so ordered.