225 So.2d 599 (1969)
J. C. TRAHAN DRILLING CONTRACTOR, INC.
v.
E. COCKRELL, Jr.
No. 7737.
Court of Appeal of Louisiana, First Circuit.
July 2, 1969.
Rehearing Denied August 28, 1969.
*600 J. C. Smith and Robert K. Mayo, Shreveport, Aycock, Horne, Caldwell & Coleman, by Jack C. Caldwell, Franklin, Breazeale, Sachse & Wilson, by Victor A. Sachse, Baton Rouge, for appellant.
O'Neal, Waitz & Henderson, by Joseph L. Waitz, Houma, for appellee.
Before LANDRY, SARTAIN and MARCUS, JJ.
*601 PAUL B. LANDRY, Jr., Judge.
J. C. Trahan Drilling Contractor, Inc. (Contractor) instituted this action against defendant E. Cockrell, Jr., a mineral lease owner (Owner), to recover a large sum of money for expenses incurred in the drilling of an oil well pursuant to a written drilling contract between the parties. The principal claim is for the expense of "fishing operations" required to extricate lodged drill pipe. Plaintiff also seeks to recover the cost of reaming the hole upon defendant's alleged arbitrary and capricious demand and for the cost of leveling the derrick, said latter item reputedly being the owner's obligation under the terms of the contract. The trial court rejected plaintiff's claims and plaintiff has appealed. We find no error in the judgment rendered by the trial court and affirm its decision.
The primary dispute between the parties concerns the use at defendant's suggestion, of a product known as Protectomagic as an additive to the drilling mud required for the boring involved. In substance, Contractor maintains use of Protectomagic caused the drill pipe to stick in the hole thereby necessitating five separate costly fishing operations. Defendant denies the Protectomagic caused the pipe to stick but contends the pipe lodged due to a condition known as differential pressure sticking. Defendant third partied Oil Base, Incorporated, manufacturer of Protectomagic, and has, out of an abundance of precaution appealed the judgment of the trial court dismissing its demand against said third party defendant.
Although the fundamental contentions of the parties are easily put as above noted, an understanding of the premises on which the opposing views are based requires relation of certain undisputed engineering principles and customs prevailing in the oil well drilling industry.
On November 30, 1965, Contractor entered into an agreement with Owner to drill a well near Patterson, St. Mary Parish. In essence the agreement provided for a "turnkey job" at a unit price of $.94 per foot to a depth of 13,500 feet. Below 13,500 feet payment for drilling services was to be on a daily basis. It is conceded plaintiff has been paid this price in full. Drilling apparently began shortly after the contract date and seemingly progressed without incident until late December, 1965, at which time it was determined the rate of penetration should be increased. After some discussion among the work representatives of both parties, it was decided, primarily by Cockrell's drilling superintendent who was in charge of the mud program, that the product known as Protectomagic be introduced into the mud mixture to accelerate penetration. Accordingly, on December 20th, a quantity of Protectomagic was added to the mud compound. Subsequently, the first difficulty was encountered at approximately 5:00 A.M., December 25, when in attempting to raise the drill pipe out of the hole, the pipe became lodged to such extent special operations were required to set it free. These procedures, commonly referred to in the industry as "fishing", involve considerable expense. Efforts to dislodge the pipe were not completed until January 10, 1966, at which time drilling resumed.
Plaintiff seeks recovery of $48,435.51 spent in dislodging the pipe, $10,606.35, representing the cost of reaming the well, and $827.50 expended to level the derrick when the fishing and remaining procedures were completed. Appellant makes three basic contentions, namely: (1) Defendant is liable under the contract since defendant retained control of the mud program; (2) Defendant is liable in tort in that the use of Protectomagic amounted to negligence because the Protectomagic reacted chemically to the clay content of the mud solution thus preventing the mud from performing its intended and desired function, and (3) the doctrine of res ipsa loquitur is applicable herein and defendant has failed to refute the presumption of negligence arising therefrom.
The contract is essentially in the standard form prepared by the American Association of Oilwell Drilling Contractors. With certain *602 inconsequential exceptions, it provided in effect that performance of the drilling and the costs and risks incident thereto were plaintiff's responsibility to a depth of 13,500 feet. It is undisputed that appellant undertook to drill and deliver a well down to the aforementioned depth, suitable for the setting of casing.
Unquestionably the terms of the agreement concerning the mud program imposed considerable responsibility on Owner. This phase of the agreement, dealing with the mixtures of clay, water and other materials which serve as a lubricant and coating substance for the drilling equipment and bore hole, provided in part as follows:
"Contractor will insure that mud, adequate in type and quantity, is on hand at all times for the operations contemplated; Contractor agrees to maintain the mud program designed by Owner; and Contractor shall be obligated to advise Owner and make recommendations to him in writing when, in Contractor's opinion, the mud program should be revised." (Paragraph 10)
An addendum to the contract entitled SPECIFICATIONS AND SPECIAL PROVISIONS, sets forth in paragraph two thereof, the complete initial mud control program and concludes with the following:
"Oil will be added if required to increase rate of penetration."
It is conceded by all parties that in the course of the drilling process "mud" is employed both as a lubricant to assist the drilling process and also to form a "filter cake" on the walls of the bore hole. It suffices to relate that "mud" as known to the trade, is generally a fluid mixture of clay, water, diesel oil and various other chemical additives depending upon the nature of the formation in which the well is being drilled. Diesel oil is added to increase penetration because it lubricates the drill bit and readily emulsifies to form a desirable "wall cake" or "filter cake", the purpose of which is hereinafter explained. Diesel oil, being inert, produces no undesirable chemical reaction with the clay particles in the mud, thus producing reduced water loss, a factor essential to a desirable and well functioning wall cake. Complete emulsification at all times is essential which result is best achieved by mixing additives such as Protectomagic in a hopper with emulsifying agents before addition to the mud formula. The mud in the tank is kept in a state of emulsification by agitators which can be used to stir the mixture when necessary or desirable.
By a process not made entirely clear in the record, the fluid mud is introduced into the well bore during the drilling process. A portion of the mud is recovered in the process of drilling and is returned to the mud tank for reuse. It is both customary and necessary that a constant check be made of the mud supply to insure its continued suitability in the light of the nature of the formation encountered.
The function of the wall cake or filter cake is to create a seal between the drill pipe and the formation. To successfully drill, the hydrostatic pressure in the bore hole must exceed that of the surrounding formation, otherwise the well will "blow-out" or "cave-in." The difference between the hydrostatic pressure in the bore hole and that of the surrounding formation is known as "differential pressure." By sealing the face of the formation with an impermeable wall cake, the two pressures are kept at their individual normal levels; the pressure in the bore hole remaining greater for the purposes shown. In addition the wall cake serves to provide a slick, smooth surface facilitating introduction and extrication of the drill pipe and casing into and out of the hole when required in the drilling operation. Best drilling results are achieved by producing a wall cake tough enough to completely seal off the hydrostatic pressure in the formation, but thin enough not to impede movement of the pipe in and out of the bore hole. A thick, sticky mud cake, as opposed to a thin, slick, oily one, will increase friction as pipe is lowered into or withdrawn from *603 the well thus causing extra "drag" and resultant pipe sticking.
Due to pressure differentials, the fluid mud tends to run into the formation surrounding the bore hole. As this occurs the clay particles contained therein are filtered out into the face of the formation thus plugging up the permeable face of the formation. As the wall cake builds up, it seals the bore hole. As a result it reduces the water flow into the formation, maintains the desired pressure differential and provides a smooth, slick conduit in which to operate. It is also conceded that diesel oil is indispensable to a proper mud mixture because it aids in holding the clay particles in the required state of suspension or emulsification in which they can properly perform their "plugging function."
Plaintiff maintains introduction of Protectomagic into the mud formula violated the contract provisions because it is not oil, particuarly not diesel oil, which is universally recognized in the industry as the oil used in mud formulae. Defendant, however, maintains that Protectomagic is not only oil but an improved form thereof inasmuch as it is composed of 80% diesel oil and 20% blown asphalt which is oil derivative.
As did the trial court, we find no merit in the argument that the use of Protectomagic violated the terms of the contract because it is not oil. Plaintiff concedes, and even argues, that the term "oil" does not mean oil in the common sense of the word but rather, diesel oil. We note that "diesel oil", as such, is not specifically mentioned any place in the contract. Plaintiff attempts to expand the term "oil" to include diesel oil simultaneously contending a product composed of 80% diesel oil and 20% blown asphalt was not within the parties' contemplation. The evidence is clearly to the effect the term "oil" contemplates diesel oil. However, the contract does not expressly prohibit use of another substance. The overwhelming preponderance of the evidence shows that within the industry the term "oil" may encompass other products as well, many of which are commonly utilized as drilling aids. Numerous witnesses, eminently qualified, so testified. While several witnesses called by plaintiff testified to the contrary, we find the record shows Protectomagic to be superior to ordinary diesel oil and its use did not violate the terms of the agreement.
Equally important, however, the record discloses plaintiff's acquiescence in the use of Protectomagic. Plaintiff's toolpusher, Rawley Dial, a man of many years' experience as a driller and toolpusher and who was second in command of plaintiff's operation, conceded he made no objection to the use of Protectomagic although he knew it was to be used and understood for what purpose. Mr. Robert F. Penn, plaintiff's drilling superintendent and first in charge of the drilling procedure, admitted Dial's supervisory jurisdiction. It is also shown that Mr. James E. Swarthout, defendant's field superintendent, was instructed to run pilot tests to determine whether Protectomagic would be a suitable additive. He found no reason why the product should not be used. Defendant's manager of drilling and production, Herbert Treichler and Swarthout, both testified plaintiff's employees were fully aware of the impending use of Protectomagic and made no objection thereto.
The terms of the contract expressly obligate plaintiff to make recommendations when plaintiff believed revision of the mud program to be in order. By the same token, plaintiff was under the duty of objecting to any revision which it deemed improper or potentially harmful. By failing to object to a known revision, plaintiff thereby in effect tacitly recommended same. Under these circumstances the claim of breach of contract is without foundation.
In support of its claim in tort plaintiff relies primarily upon the testimony of Dr. Emanuel Paul Bercegeay of the Petroleum Engineering Department of the University of Southeast Louisiana. In substance Dr. Bercegeay attributed the jamming of the *604 drill pipe to a phenomenon known as "differential pressure sticking." He attributed this result to use of the Protectomagic.
Dr. Bercegeay explained that differential pressure sticking results from the failure of the wall cake to effectively perform as a seal, thus permitting hydrostatic pressure in the formation to infringe upon the hydrostatic pressure in the bore hole. According to Dr. Bercegeay (and all other experts), theoretically the drill pipe should remain suspended vertically in the hole surrounded on all sides by the equal hydrostatic pressure of the bore hole, thus suspended it remains free of contact with the sides of the bore hole. In this position, sticking or jamming is impossible. However, if the wall cake fails, the force of the greater hydrostatic pressure in the hole forces the pipe toward the side of the hole on which the failure occurs because of the inability of the weaker formation pressure to overcome the greater force of the pressure in the hole. The result is that the pipe becomes lodged against the face of the formation and sticks. Because this result is produced by the difference between the two pressures involved, it is known as differential pressure sticking.
Dr. Bercegeay was of the view differential pressure sticking occurred in this instance because the water content of the mud escaped due to the use of Protectomagic. He stated that the seal failed because the Protectomagic chemically reacted with the clay particles in the mud thus preventing them from breaking down to collodial size and remaining completely and individually dispersed, a result necessary for them to properly perform their function as plugging agents. Dr. Bercegeay explained that in collodial size, the clay particles suffer little water loss and form an effective seal. In his view, however, the Protectomagic was not thoroughly emulsified before being added to the mud tank. Consequently, in Dr. Bercegeay's opinion, a chemical reaction known as "flocculation" took place. He explained flocculation as a gathering of the clay particles into "little round bundles" instead of remaining as separate "little flat sheets", the state in which they exist in collodial size individually dispersed throughout the mud mixture. As "little round bundles", they leave openings in the wall cake or mixture rather than forming a tight impermeable wall filter. The openings thus left result in a permeable wall filter through which fluids migrate causing a pressure differential with resultant pipe sticking.
Dr. Bercegeay concluded improper emulsification and resulting flocculation stemmed from the Protectomagic being introduced into the mud by means of a hose instead of having been run through a hopper to mix it with other additives. Upon being informed a hopper was in fact employed, he then opined the Protectomagic was added without using a proper emulsifying agent. When told an emulsifying agent known as RD-11 was used, Dr. Bercegeay maintained the substance was not an emulsifier. In this regard his testimony was contradicted by several witnesses who regularly used RD-11 as an emulsifier. Finally, Dr. Bercegeay concluded flocculation resulted from a chemical reaction between the asphalt in the Protectomagic and the clay particles in the mud. Dr. Bercegeay was also of the view the asphalt in the Protectomagic broke down due to the high temperature and pressure inside the bore hole and reacted with the clay.
Notwithstanding Dr. Bercegeay's impressive background and experience, he was contradicted by defendant's witnesses, some of whom are of equal note.
Mr. Duane Wilson, petroleum chemist of note, inventor and producer of Protectomagic, testified extensive laboratory tests have established that the manner in which the asphalt is combined with diesel oil to form Protectomagic makes it possible for Protectomagic to readily enter into a stable emulsion in a mud system. He also testified that neither heat nor pressure cause the product to chemically react with clay. In short, he stated Protectomagic performs the same function as diesel oil, only better.
*605 Dr. Billy R. Hise of the Louisiana State University Petroleum Department was of the opinion it was impossible to state positively what caused the pipe to stick in this instance since, obviously, an opinion in this regard must be based on circumstantial evidence. In his judgment, it was more probable the sticking resulted from a phenomenon known as "key seating." Dr. Hise explained that key seating occurs when the collars of the drill pipe become lodged in grooves formed in the wall of the well bore during the drilling process. According to the witness, each length of drill pipe is equipped with a "collar" which is part of the system by which the pipes are joined and held together. The drill collars are somewhat larger in diameter than the pipe itself. Key seats are grooves cut into the wall of the bore hole by the rotation of the drill pipe during the drilling procedure. Ordinarily, key seats occur at the apex of angles created in the hole when the drill pipe deviates from the perpendicular. These angles are known in the trade as "dog legs." Dr. Hise explained further that the pipe has a tendency to lie against the wall of these bends, angles or dog legs. Grooves or key seats are formed at these points by the abrasive effect of the rotating smooth drill pipe against the wall of the formation.
Dr. Hise noted that sticking due to key seating generally occurred as pipe is being withdrawn from the well. He explained that when the pipe collars reach a key seat, they are too large to pass through and become lodged. He also observed that the records show the initial sticking occurred at a depth at which the well log showed a deviation of slightly less than 4 from the vertical, 4 being the maximum deviation permissible under the contract. In addition, Dr. Hise noted the evidence preponderated to the effect the sticking occurred, in every instance, as pipe was being removed from the well. Also, according to Dr. Hise, the pipe stuck at such minimal depths that differential pressure sticking could not mathematically have been a factor because of low pressures encountered at these shallow depths.
Numerous other defense witnesses, of lesser qualifications, shared the views expressed by Dr. Hise.
The preponderance of expert testimony is to the effect that flocculation can and should be visibly detected by an experienced mud engineer. William Green Busch, Jr., mud engineer, employee of the mud service company which supplied mud ingredients, except Protectomagic, testified he was present daily at the well site. He verified that the Protectomagic was added by means of a hopper and that an emulsifier was also added. Mr. Busch detected no visual signs of flocculation. He testified further that daily chemical analysis of the mud disclosed a reduction in alkalinity after the first addition of Protectomagic. He also noted that little change in water loss occurred during the first few circulations following introduction of Protectomagic but within a few days, the rate of water loss improved significantly.
Appellant, basing its claim in tort on an alleged chain of causation, bears the burden of proving the circumstances with reasonable certainty. Considering plaintiff's claim must of necessity be based on circumstantial evidence, the controlling rule is that causation may be established by circumstantial evidence. To discharge the burden of proof in such instances plaintiff must produce circumstantial evidence which, taken as a whole, excludes other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that all other possible causes must be disproved or negated. Otherwise the mere disclosure in the record of another possibility not shown to be causally active would break the chain of causation and defeat recovery. See Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395, and authorities therein cited.
We conclude, as did the trial court, that appellant has failed to discharge the *606 burden required by law. Here two reasonable hypotheses are shown. Plaintiff's evidence regarding the hypothesis of sticking due to differential pressure does not exclude with a fair amount of certainty, defendant's hypothesis of sticking due to key seating. On the contrary, we are of the view the evidence, as a whole, preponderates in favor of the conclusion the pipe stuck due to key seating.
The doctrine of res ipsa loquitur is a rule of evidence, applicability of which is to be determined at the conclusion of the trial. Day v. National United States Radiator Corporation, 241 La. 288, 128 So. 2d 660.
When the doctrine of res ipsa loquitur is applicable, the circumstance causing plaintiff's injury makes out a prima facie case of negligence, which shifts the burden on the defendant to show absence of negligence on his part. Gerald v. Standard Oil Company of Louisiana, 204 La. 690, 16 So.2d 233.
For the rule of res ipsa loquitur to apply, the circumstances attending the accident must be such as to create an inference of negligence on defendant's part. To establish such inference, two indispensable conditions must be shown. First, the instrumentality or circumstance causing the injury must be exclusively within defendant's control. Secondly, it must appear plaintiff was not in a position to show or explain the particular circumstances causing his injuries but that defendant, being in control, possessed superior knowledge or means of information as to the cause of the accident. Dorman v. T. Smith & Son, 223 La. 29, 64 So.2d 833.
Applying the foregoing rule to the case at hand, we find the doctrine of res ipsa loquitur inapplicable herein. Defendant did not have exclusive control of the drilling procedure. Here there was a division of control, plaintiff having at least equal, if not major control. Moreover, plaintiff has not established it was not in a position to know or establish the cause of the loss. Neither does it appear defendant possessed superior knowledge or means of information regarding the subject matter of the dispute. On the contrary, it affirmatively appears, plaintiff's knowledge of the circumstances is equal to that of defendant.
There remains appellant's claims for $10,606.35 for reaming the well and $827.50 for leveling the derrick. As pointed out by our learned brother below, very little reference was made to these claims in the course of this lengthy hearing which consumed 12 trial days. The record contains a paucity of evidence in support of these particular demands. The testimony of several of the witnesses costs doubt as to the substance of these alleged rights.
Defendant's field superintendent, Swarthout, testified that upon attempting to set casings in the hole at drilling completion, he was unable to do so because of the lack of uniformity of the hole circumference. Pertinent to this phase of the controversy is Section 3 of the contract which stipulates as follows:
"3. Contractor agrees to
(h) Drill a hole of sufficient diameter to set casing as specifed; the setting of all such casing required shall be by steel line measurements, at points designated by Owner and in a manner acceptable to Owner."
The foregoing provision clearly imposed upon the Contractor the obligation to produce a well bore capable of accepting casing. It is significant that plaintiff's own employees, Newcomer and Dial, testified they considered defendant's request that the well be reamed was neither arbitrary nor capricious.
Regarding the expense of leveling the derrick, defendant's witness, Swarthout, pointed out this expense is one ordinarily borne by the drilling contractor according *607 to what he understood to be the custom of the industry. Additionally, while there is no specific contractual provision covering this item, Section 5 of the special provisions addendum entitled, EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY CONTRACTOR, provides, inter alia, Contractor shall furnish the drilling rig and seemingly all apparatuses and appurtenances required in a complete rigging operation. It follows, in our opinion, under such a provision, the expense of leveling the derrick was intended to be at Contractor's expense.
Accordingly, the judgment of the trial court rejecting the demands of appellant, J. C. Trahan Drilling Contractor, Inc., and those of third party plaintiff-appellant, E. Cockrell, Jr., is affirmed; costs to be paid by plaintiff-appellant, J. C. Trahan Drilling Contractor, Inc.
Affirmed.