Robert L. WATERBURY,
Plaintiff-Appellant,

v.

BYRON JACKSON, INC., Defendant-
Third-Party Plaintiff-Appellee,

v.

William G. BLACKWELL et al.,
Third-Party Defendants.

No. 76–2640.

United States Court of Appeals,
Fifth Circuit.

July 20, 1978.

Carl W. Cleveland, C. Ellis Henican, Jr., New Orleans, La., for plaintiff-appellant.

Timothy J. McNamara, Lafayette, La., for defendant-third-party plaintiff-appellee.

Before COWEN *, Senior Judge, GOLD-BERG and AINSWORTH, Circuit Judges.

COWEN, Senior Judge:

This case comes to us on the plaintiff's appeal from a judgment against him in the United States District Court for the Western District of Louisiana. In the court below, the plaintiff claimed that the defendant's negligence effectively caused the loss of an oil well which the plaintiff owned. On appeal, the plaintiff frames the issues in terms of negligent breach of contract and failure to meet the standard of care required of one holding himself out to be an expert. It matters not how the plaintiff styles his cause of action; he has not proved his right to recovery under any theory. We affirm the judgment of the District Court.

The plaintiff, Robert L. Waterbury, is an individual residing in Louisiana. He is an accountant by education, and an experienced oilfield operator and wildcatter by profession. Sometime before the events leading to this suit, the plaintiff bought a working interest in an oil well known as the Broussard No. 1A well. This well had been drilled by another operator but not worked. The plaintiff hoped to find therein a commercially valuable source of oil.

The well was small by normal oilfield standards: the casing was only $2\frac{7}{8}''$ in diameter. Equipment for wells of this size is called "macaroni" in the trade, emphasizing its smallness. It is well known by those working in this field that smaller wells are riskier to work than larger wells. With the advice of Mr. William Blackwell, a consulting engineer, and guided by his own experience and judgment, the plaintiff developed a plan of operation for reworking the Broussard No. 1A well. The plan called for "cement squeezes" to be performed on two of the three sets of perforations left by the first driller. To understand these operations, a bit of background is needed.

The oil well itself was simply a vertical hole about $7''$ in diameter. A casing, or long metal tube, $2\frac{7}{8}''$ in diameter, was lowered into the hole, and the space between the outside of the casing and the wall of the hole was filled with poured cement. Operations in the well were carried out using cylindrical metal tubing $1\frac{1}{4}''$ in diameter. This tubing was lowered into the casing with drilling tools or other equipment attached to the end. The well was kept filled with salt water, and was hermetically sealed at the Bradenhead (the opening of the well at the surface).

The well was explored for oil by lowering small explosive shells into the casing and shooting them through the casing and the cement at levels where oil was sought. In the Broussard No. 1A well, the previous owners had done this at three different levels, leaving perforations at each level. Feeling that the well would not be profitable, they then sold it in this condition to Mr. Waterbury. Mr. Waterbury believed that oil could be recovered from the deepest of the three sets of perforations made by the first owner. Mr. Waterbury's plan of reworking called for the perforations at the first two levels to be sealed off by cement squeezes. These were the operations he hired the defendant to perform.

A cement squeeze is a technique for filling perforations with cement, making them

---

* Senior Judge of the Court of Claims, sitting by designation.

watertight. The first step in any squeeze is the insertion of a watertight disc, called a "drillable bridge plug," into the casing just below the perforations to be squeezed.[1] This isolates the perforations from all lower sections of the well. The next step varies with the kind of squeeze to be done. If the squeeze is a "packer squeeze," the simplest and most common kind of squeeze, the tubing is lowered into the casing with a packer attached to the end. The packer is a tool for sealing off the casing at any desired level; in a squeeze, the packer is set just above the perforations. The packer and the bridge plug thus create a watertight chamber in the well, with the perforations between them. With the packer in place, a watery cement slurry is pumped down the tubing into the chamber at high pressure. The slurry is forced through the perforations into the cement surrounding the casing and the rock just outside. When enough cement has been squeezed into the perforations, the packer is released and the entire well (down to the bridge plug) is flushed with salt water to remove any remaining slurry. After the cement has set, the squeeze is pressure tested to insure that the sealing is complete. The bridge plug is then drilled out and the well is ready for further operations.

The defendant successfully performed a packer squeeze on the highest set of perforations in the Broussard No. 1A well. Mr. Waterbury then decided that the second squeeze, which was to take place about a week later, should not be a packer squeeze, apparently because he did not want to pull all the tubing (some 9,000 feet) out of the casing to remove the mill (drillhead) he had used to drill out the bridge plug and attach a packer in its place. Mr. Waterbury decided to use a "Bradenhead squeeze" and to leave the mill on the tubing.

In a Bradenhead squeeze no packer is used. The chamber to be pressurized and pumped with slurry, extends from the bridge plug below the perforations all the way to the Bradenhead, which (it will be recalled) is hermetically sealed. The cement is kept confined to the area of the perforations by regulating the pressure of the salt water in the well column, balancing its pressure against the pressure of the cement being pumped down the tubing. The Bradenhead squeeze is more complicated, and therefore somewhat riskier, than the packer squeeze.

The trial judge found that the defendant's personnel were not told until the morning that they arrived at the well that a Bradenhead squeeze, not a packer squeeze, was to be performed. They went ahead with the squeeze, however. Sometime during the operation, for reasons which the trial judge could not determine with certainty, cement flowed up the well column past the mill at the end of the tubing and into the annulus (the space between the tubing and the casing). As a result, the tubing stuck in the casing and could not be removed. The well was hopelessly plugged and had to be abandoned.

Such, in brief, are the facts on which the plaintiff bases his cause of action. He alleges that the loss of the well was caused by the defendant's negligent breach of his contract, asserting that negligence can be inferred from these facts by the application of the doctrine of *res ipsa loquitur.* In addition, he avers that the negligence issue must be examined applying a standard of care higher than normal because the defendant held itself out to be an expert in its field.

Establishing negligence is ordinarily a mixed issue of law and fact. The determination of the standard of care to which the defendant must be held is a question of law, although its legal formulation is guided by proved facts. Deciding whether the defendant adhered to that standard is then a pure question of fact. 65A C.J.S. Negligence § 252a. The plaintiff challenges the trial judge's decision on each of these issues.

---

1. In the Broussard well, bridge plugs had apparently been left between the three sets of perforations by the original owner.

## I. *The Standard of Care*

■ Turning first to the standard of care required, the plaintiff argues that Louisiana law demands from one holding himself out to be an expert a degree of care concomitant with the degree of expertise claimed. *Wurst v. Pruyn*, 250 La. 1109, 202 So.2d 268 (1967). The expert's standard of care includes a duty to warn the layman with whom he contracts of dangers of which he, as an expert, is aware, and the layman is not. *Wurst v. Pruyn, supra,* 202 So.2d at 273; *Mixon v. Brechtel,* 174 So. 283 (La.App.1937). The trial judge, says the plaintiff, failed to hold the defendant to this higher standard of care.

This argument fails because the trial judge's opinion shows, we think, that he correctly evaluated the standard of care required of a contractor like the defendant. The judge's finding 20 reads, in part:

> * * * negligence on the part of Defendant Byron Jackson, Inc. or Plaintiff Waterbury can only be inferred from their observing or failure to observe *established standards and responsibilities of service companies and operators* respectively in performing squeeze operations. * * * [Emphasis supplied.]

Therefore, to the extent that plaintiff's attempt to characterize the defendant as an "expert" has any validity, the trial judge recognized the standard of care ordinarily required of such contractors in this field. The "expert" is required to do no more than adhere to this standard. *Thibodaux v. McWane Cast Iron Pipe Co.,* 381 F.2d 491 (5th Cir. 1967). The plaintiff argues strenuously that more should be required of a cement squeeze operator than the trial judge required in this case, but has presented no evidence that the trial judge failed to consider any extra duty that might be demanded of one holding himself out as skilled in this field. On the contrary, it appears that the judge gave the issue full consideration and held this defendant to the standard of care generally expected in the industry at this time. The judge found as a fact that oil well operators traditionally make most of the decisions about all but the smallest details of operations in their wells. The service company does what it is asked to do, and it is not required to warn experienced operators of dangers with which they can be presumed to be familiar. From these facts, which we have been shown no reason to disturb, the judge deduced the legal standard of care required of an independent squeeze contractor.

■ Nor can the plaintiff attack this standard by claiming that he "relied" on the expertise of the contractor. Mr. Waterbury testified that he informed the defendant's dispatcher that he was an accountant, not an engineer, and that he was highly dependent on third parties. He now argues that this behavior cast a higher duty on the contractor. But it is the conduct of the defendant, not the plaintiff, which must determine the standard of care against which the contractor is to be judged. Furthermore, Mr. Waterbury may well have stated that he was an accountant and disclaimed technical expertise, but when he specified a Bradenhead squeeze instead of a packer squeeze and otherwise acted like a knowledgeable oil well operator, we cannot think that any of the defendant's employees would have placed overwhelming significance on his statements of reliance. In *Rorem v. Halliburton Oil Well Cementing Co.,* 246 F.2d 427 (5th Cir. 1957), a case almost eerily similar to this one, the operator made the same argument. On appeal from a jury verdict in favor of the contractor, this court wrote that:

> * * * the jury was certainly not required to accept [the owner's] major theme, oft repeated, that he was "relying" on the Cementer. * * * [*Id.* at 432.]

This case demonstrates further that the trial judge selected the proper standard of care to apply to the contractor's conduct.

## II. *Res Ipsa Loquitur*

The plaintiff's principal quarrel with the report of the trial judge is that the question of the applicability of the *res ipsa loquitur* doctrine was not expressly rejected, or indeed even mentioned, in the findings and

conclusions. The plaintiff infers from this omission that the trial judge did not consider the question, and argues that this court should consider it, apply it, and reverse the decision below. The way we read the trial judge's findings and conclusions, the doctrine is clearly not applicable under the facts of this case, and the trial judge was correct in refusing to apply it.

■ Under Louisiana law, *res ipsa loquitur* is a rule of evidence which assists the plaintiff in carrying his burden of proof by supplying him with an inference of negligence in certain carefully defined circumstances. *Boudreaux v. American Insurance Co.*, 262 La. 721, 264 So.2d 621 (1972).

> " * * * This inference is not drawn merely because the accident occurred or the thing speaks for itself, but because all of the circumstances surrounding the accident are of such a character that the only fair and reasonable conclusion is that the accident was due to some omission of the defendant's duty * * *."
> [*Id.* 264 So.2d at 627, quoting *Fruge v. Trahan*, La.App., 194 So.2d 478, 482 (1967).]

The *Boudreaux* case makes it clear that the doctrine cannot be applied unless it is *more probable than not* that the defendant's negligence caused the damage.

The plaintiff stated in the briefs and at oral argument that he had no objections to the trial judge's findings of fact. The judge found as a fact that it was impossible to determine the cause of the accident, but that it was most likely that the accident had been caused by the negligence of the plaintiff himself. Specifically, the judge wrote:

> * * * Although the evidence establishes a possibility of negligence on the part of [the defendant], it falls far short of the burden of proving such negligence. In fact, far more substantial negligence can be inferred against Waterbury himself. * * * [Finding 20.]

Determining compliance with a particular standard of care is, as we have seen, primarily a factual issue.[2]

■ The plaintiff's lengthy arguments in the brief about the impossibility of any cause for the accident other than the defendant's negligence, then, are directly contradicted and refuted by the trial judge's findings of fact, with which the plaintiff says he does not quarrel. (Nor, we think, could he have successfully contested those findings on appeal, since they were supported by substantial evidence.) Simply put, the judge found that the accident was most probably caused by the negligence of the plaintiff himself, and that there was no occasion under Louisiana law to consider the doctrine of *res ipsa loquitur* in such circumstances.

■ This conclusion comports with the results reached by other courts in cases involving accidents quite similar to this one. In *J. C. Trahan Drilling Contractor, Inc. v. Cockrell,* 225 So.2d 599 (La.App.1969), the drilling contractor sued the well owner to recover the cost of extricating a lodged drill pipe. The expert testimony on the issue of why the drill stuck was, as here, conflicting. The court held that the doctrine of *res ipsa loquitur* was not applicable, since the contractor and owner had shared control of the operation. Control of the cement squeeze performed in the case at bar was similarly divided: although the defendant's agents had control of the instrumentalities of the squeeze while it was being performed, the plaintiff had complete control over the planning and preparation for the squeeze. Where control is divided, *res ipsa loquitur* will not be applied. *A. & J., Inc. v. Southern Cities Distributing Co.,* 173 La. 1051, 139 So. 477, 478 (1932). In *Pure Torpedo Corp. v. Nation,* 327 Ill.App. 28, 63 N.E.2d 600 (1945), a blasting contractor sued the oil well owner for money on account, and the

---

2. Without going into extensive detail, the plaintiff's negligence consisted of decisions he made about the type of cement to be used, the kind of squeeze to be performed, proceeding with the squeeze with the mill attached to the tubing (and not informing the defendant of this decision until the squeeze was under way), the kind of well fluid to employ, and how thoroughly to test the casing.

**1100**

owner counterclaimed, alleging negligence in the performance of the service. As in the case at bar, the evidence was lost in a damaged oil well; the court held the doctrine of *res ipsa loquitur* inapplicable. *Cf. Worcester v. Pure Torpedo Corp.,* 140 F.2d 358 (7th Cir. 1944).

Finally, in *Rorem v. Halliburton Oil Well Cementing Co., supra,* a case whose facts come close to duplicating ours, the court was faced with the problem of reconciling apparently inconsistent answers of a jury on special verdicts. The jury had found the cementer negligent in its answer to one interrogatory, but exonerated him in answering another by saying that the owner had been negligent and the cementer had not. This court found no inconsistency, holding that:

> \* \* \* The finding that the Cementer was not, but that [the owner] was, negligent was the jury's way of concluding, as they had a right to do, that the obligation remained on the well owner to follow all accepted industry precautionary procedures and a failure to do so could not be excused because another (Cementer) might have made an error. [*Id.* at 430–31.]

The trial judge in this case did exactly what the jury in *Rorem* was permitted to do. Since the facts permitted the conclusion that the accident was most likely due to the plaintiff's negligence, the doctrine of *res ipsa loquitur* cannot be applied. The plaintiff cannot recover, and the judgment of the District Court is—

AFFIRMED.