The DOW CHEMICAL COMPANY

v.

TUG THOMAS ALLEN, her engines, tackle, apparel, furniture, etc., in rem, et al.

Louie Ray BROWN

v.

NEW YORK UNDERWRITERS INSURANCE COMPANY et al.

Civ. A. Nos. 71–526, 71–530.

United States District Court, E. D. Louisiana.

Sept. 14, 1972.

James B. Kemp, Jr., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Dow Chemical.

George A. Frilot, III, Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, New Orleans, La., for New York Underwriters.

Donald L. King, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Utica Mutual Insurance Co.

H. Harwell Herrin, Diaz & Herrin, Golden Meadow, La., for Pitre & Guildry Towing Co.

Philip E. Henderson, Henderson, Hanemann & Morris, Houma, La., for plaintiff Brown.

Stanley E. Loeb, Loeb & Livaudais, New Orleans, La., for defendant Dow.

MITCHELL, District Judge.

These cases involve a fire aboard the manned *Barge 19–10* owned by Dow Chemical Company [1] while in tow of the Tug THOMAS ALLEN.

The first suit is brought by Dow [2] as owner of the *Barge 19–10* against the Tug THOMAS ALLEN, *in rem*, against her owner, Pitre & Guidry Towing Co., Inc.,[3] *in personam*, and against the primary and excess hull and tower's liability insurers of the Tug THOMAS ALLEN, New York Underwriters Insur-

---

1. Hereinafter referred to as Dow.

2. Civil Action 71–526.

3. Hereinafter referred to as Pitre & Guidry.

ance Company[4] and Utica Mutual Insurance Company,[5] respectively. Dow's complaint claimed damages for the cost of repairing the barge and loss of use on the ground of negligent towage, breach of the warranty of workmanlike service and breach of a contract of towage, all resulting from an explosion and fire caused by a collision with an unmarked submerged gasline while the Barge 19–10 was in tow of the Tug THOMAS ALLEN in an oil field in Quarantine Bay, Louisiana, on February 28, 1970.

Dow, as a named assured, also claims damages (including attorneys fees, penalties and interest) for nonpayment pursuant to the insurance coverages afforded by New York and Utica.

Louie Ray Brown, a seaman employed by Dow aboard the Barge 19–10, filed an action for personal injuries[6] against his employer and its insurer, Fireman's Fund Insurance Company[7] under the Jones Act and general maritime law. Also named as defendants in this action were Pitre & Guidry and its primary and excess insurers, New York and Utica.

Dow and its insurer, Fireman's Fund, filed a cross-claim against Pitre & Guidry and its two insurers, contending that the contract of towage and the insurance policies obligated these defendants to indemnify Dow from any loss resulting from the casualty. They also seek reimbursement of maintenance and cure paid Brown, and reasonable attorneys fees.

Pitre & Guidry seek limitation of liability in both actions.

These actions were consolidated for trial on the merits and tried to the Court

on a former date.[8] By stipulation, all parties settled Brown's claim;[9] the Court was simply to determine who should bear any, all or part of the loss of Brown.

After careful consideration of the evidence adduced at trial, briefs submitted by counsel and the law, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### I.

At all times pertinent hereto Dow, a Delaware Corporation, was the owner and operator of the service Barge 19–10, a non-self propelled, flat-deck inland coastal water vessel, approximately 120 feet in length, 35 feet in breadth and 8 feet in depth.

### II.

At all times pertinent hereto, Louie Ray Brown was a citizen of the State of Mississippi, employed by Dow aboard its Barge 19–10.

### III.

At all times pertinent hereto, Fireman's Fund was the general liability insurer of Dow as owner of Barge 19–10.

### IV.

At all times pertinent hereto, Pitre & Guidry, a Louisiana corporation, was the owner and operator of the Tug THOMAS ALLEN, a twin screw steel-hull model tug, approximately 49.1 feet in length, 17.1 feet in breadth and 7.1 feet in depth.[10]

---

4. Hereinafter referred to as New York Underwriters.

5. Hereinafter referred to as Utica Mutual.

6. Civil Action 71–530.

7. Hereinafter referred to as Fireman's Fund.

8. By agreement of counsel, the damage and liability portions of these actions were severed.

9. The stipulation dated April 14, 1972, provided that judgment be entered in favor of Louie Ray Brown in the sum of $168,750.00, with interest at the legal rate to run beginning 30 days from April 14, 1972. It was further agreed that the above settlement was to be free and clear of any amounts paid for maintenance and cure.

10. Exhibit Dow 8.

## V.

Pursuant to a Towing Contract [11] between Pitre & Guidry and Dowell, a division of Dow, on February 27, 1970, the Tug THOMAS ALLEN was standing by Dow's *Barge 19–10*, which was completing the servicing of a well for Gulf Oil Corporation on Ward Rig Number 7, located in Quarantine Bay, Louisiana. The waters of Quarantine Bay are relatively shallow outside the main deep-water channels. In connection with drilling operations being conducted in the bay, unmarked submerged gas pipelines ran between the rigs. The evidence reflects that if any charts showing the locations of these pipelines existed, none were aboard the tug or the barge.

## VI.

The crew aboard the THOMAS ALLEN consisted of her master, Forrest Anthony "Cisco" Plaisance, a tug skipper with approximately 18 years of experience on inland waters, and Harris J. Savoie, deckhand-cook. The barge was manned by Dow employees: A. J. Richard, a service engineer, who was in charge of the barge and the men on her; and two marine equipment operators, Louie Ray Brown and Edward Eugene Jones. None of Dow's employees had any experience in navigating a tug.[12]

## VII.

Shortly after midnight, at approximately 1:00 a. m. on February 28, 1970, Dow completed its job aboard Ward Rig No. 7. Upon being told by a Gulf Oil Company employee to proceed with dispatch to Williams Rig No. 7 for a similar job, Richard told Captain Plaisance that the men on the Williams Rig were waiting and to get there as quickly as possible.

Upon information from the Gulf employee, Richard told Plaisance to tow the barge in a straight line from Ward Rig No. 7 to Williams Rig No. 7. Richard and the other personnel aboard the barge then went to sleep.

## VIII.

The Williams rig was approximately one half mile away and clearly in sight. The tide was low. After making up to the *Barge 19–10* in a "push" position, the THOMAS ALLEN proceeded toward Williams Rig No. 7 as directed. About half-way across, the THOMAS ALLEN ran aground on a sandbar. The tug captain radioed E. P. Lucas, the Dow dispatcher at Venice, Louisiana, who instructed Captain Plaisance to get the tug off the strand and to reach the Williams Rig as quickly as possible. After unsuccessful attempts to free the tug from the strand, the tug captain shut down to await high tide, and went to bed, leaving his deckhand on watch.

## IX.

When Richard awakened at daybreak, approximately 5:00 a. m., he noticed the vessels were at a standstill. He boarded the tug, awakened the captain, and they returned to the barge for a discussion over a cup of coffee. Richard testified that he advised the tug captain that Dow was running late, the men on the Williams rig were waiting for them, and that the THOMAS ALLEN had to attempt to get to the Williams Rig No. 7.

Captain Plaisance testified that Richard directed that the tug back track over the same course used to reach the point of the strand and to return to the deep-water channel marked with buoys. From there the tug was ordered to follow a course through another deep-water channel, likewise marked with buoys, until reaching a point where it would be necessary to leave the deep-water channel and proceed over the shallow areas of the bay to Williams Rig No. 7.[13]

The uncontradicted evidence reflects that the tug captain protested, stating that he knew there were unmarked, submerged gaslines in the shallow areas of

11. Exhibit Dow 11.

12. Testimony of A. J. Richard.

13. See Exhibit New York 1.

the bay adjacent to the deep-water channel and that he did not know the location of those gaslines. He further stated that if such a course were followed, he could not be responsible for striking the unmarked, submerged gaslines.[14]

### X.

When Richard persisted that the tug attempt to reach Williams Rig No. 7 since the *Barge 19–10* was already late, the tug captain requested a guide boat to lead the tug through the shallow areas containing the unmarked, submerged gaslines. The tug was made up in a pull position and proceeded to her destination. When the flotilla was in the main channel, Dow's dispatcher, Lucas, was contacted, and a guide boat was requested. However, the testimony reflects that Lucas reported that none was available at that time.

Captain Plaisance stated to both Richard and Lucas that the water in Quarantine Bay was shallow, that he did not know where the gas pipelines were, and that it was dangerous to proceed without a guide boat.

Lucas and Richard told Plaisance they must get to the rig as quickly as possible.[15]

### XI.

At Lucas' request, radio contact was made with Norris Falgout, captain of the tug BAYPORT, who had been last to work Quarantine Bay. Captain Falgout and the BAYPORT generally did the same type of work as Captain Plaisance and the THOMAS ALLEN.

Captain Falgout told Richard that the field was dangerous, but if a man knew what he was doing, he shouldn't have any trouble.

Plaisance, not to be outdone by Captain Falgout, said he knew where he was and what he was doing.[16]

Plaisance admits making this statement, explaining that he meant that he knew the field, but did not know where the pipelines were.

### XII.

The flotilla, with the tug pulling the barge stern first, proceeded in the marked navigable channel. As it reached a point abreast of the Williams Rig, Captain Plaisance made the decision to turn out of the channel into the bay toward the rig, which was plainly in view.

As anticipated, the water in the bay was shallow. The barge drew between 4½ feet of water; the tug drew approximately 5½ feet at her keel and, when pulling the barge, had a tendency to squat approximately 6″ deeper in the water. Captain Plaisance testified that the tug was not dragging bottom as the flotilla slowly made its way to the rig.

The Court finds no evidence to indicate that Captain Plaisance acted unreasonably in turning into the bay at that point or proceeding in a straight line to the rig. The testimony reveals that there were no markings to indicate any type of existing underwater obstructions.

### XIII.

At approximately 6:30 a. m., after the tug was approximately 200 feet into the bay from the channel, the tug collided with a four-inch gas pipeline, causing an explosion which was followed by fire, which engulfed the galley of the barge; Brown went out onto the deck and was severely burned.

Immediately upon seeing flames, Captain Plaisance yelled to Savoie to wake up and cut the towline. This was done so the wind would carry the barge from the fire. Plaisance immediately radioed to Lucas to report the fire.

Richard jumped overboard; in a few minutes Richard, Jones and Brown were rescued by speedboats from the Williams Rig.[17]

---

14. Testimony of A. J. Richard, E. P. Lucas and Captain Norris Falgout.

15. Testimony E. P. Lucas.

16. Testimony of E. P. Lucas, Captain Falgout.

17. Testimony of Edward E. Jones.

### XIV.

The Court finds as a fact that the fire and explosion which precipitated the damages happened because the *Barge 19–10* was towed through a dangerous field of unmarked, submerged gas pipelines without a guide boat to lead her, without a map charting the location of the gaslines and without a captain who knew where the gaslines were located.

### XV.

Although the tug had navigation charts aboard, she had no pipeline charts, nor was she equipped with a depth finder.

The Court finds that failure of the tug to be equipped with a depth finder or charts showing the specific locations of pipelines in Quarantine Bay was not the proximate cause of the casualty under the facts and circumstances of this particular case.

Captain Plaisance testified that on prior occasions he had never been asked to traverse Quarantine Bay without the aid of a guide boat to lead him through the field.

Louis Pitre testified that he had never checked to see if the tug had pipeline maps of the Quarantine Bay area aboard because the only people who had them were the oil companies and they do not furnish the boat companies copies thereof.

Although no evidence was introduced on this point, the Court is well aware that, generally speaking, pipeline charts are not readily available to the public. Usually they can only be secured from the owner of the pipelines, in this case Gulf.

Under the terms of the towing contract, the THOMAS ALLEN was "confined to the inland waters of the States of Louisiana and Texas . . .". Nowhere is Quarantine Bay mentioned. Although Quarantine Bay is an inland body of water located in the State of Louisiana, there was no evidence introduced to show that Pitre, when it leased its tug, knew that the tug would be operating in Quarantine Bay and therefore should have pipeline charts aboard. It appears to the Court that if anyone knew that the THOMAS ALLEN would be operating in Quarantine Bay, it would have been the barge owner and if anyone had a duty to have those charts aboard, it would have been the duty of DOW.

### XVI.

The Court finds that Dow was negligent in directing Captain Plaisance to proceed through a dangerous area without a guide boat, knowing that he was totally unfamiliar with the location of pipelines.

When the tug was stranded near Ward Rig No. 7, it was Richard who directed the route the flotilla was to take to get to the Williams Rig; and it was Richard and Lucas who stressed the fact that the flotilla was late and they must hurry to the Williams Rig. It certainly appears to the Court that although Plaisance was in charge of how to navigate the flotilla, i. e., the manner in which it was piloted, it was Richard who directed when, where and what route was to be taken.

Even Dow's expert, Arthur Terry, testified that generally, companies engaged in oil exploration, directed the activities of the vessels in their employ, ignoring the advice and warnings of experienced mariners. Although under normal circumstances Plaisance may have been the person in charge of picking the route, the court finds that in this instance it was Richard who was giving the orders. Even Captain Falgout, experienced in the same type of work, testified that the Engineer is always in charge of the tow, "he tells us where to go and what to do."

### XVII.

Although no evidence was introduced showing that Captain Plaisance was proceeding at excessive speed or was negligent in the manner in which he towed the barge, the Court finds that Plaisance was guilty of negligent towage in towing the *Barge 19–10* into the shallow area while knowing of the presence of pipe-

lines; he knew or should have known that to proceed without a guide boat or a chart was risking not only his life, but the lives of all persons aboard the tug and the barge.

Captain Plaisance testified that if he had failed to proceed with the navigation, he and the tug would be out of a job. Although this was somewhat confirmed by Captain Falgout, neither Richard nor Lucas made any threats to Plaisance, nor did they have the power to fire him. However, Richard did testify that if Plaisance had refused to take the barge where Richard told him, Richard would "pass it on to my people".

Captain Falgout also testified that it was not unusual for Dow to order vessels to proceed under dangerous conditions in order to meet its work schedule.

Even Arthur Terry, Dow's expert, conceded that in cases involving the oil industry, it was not unusual for a tug captain to proceed as directed "under protest", notwithstanding his belief that it might be dangerous. And that because of economic reasons, a tug captain must work under unsafe conditions.

Notwithstanding the above, the Court finds that in the situation at bar, Captain Plaisance had an affirmative duty to refuse to navigate the flotilla until he had been furnished with a guide boat or a map charting the location of the pipelines, even if it meant losing his job. He did not have the right to risk the lives of the men aboard the barge or the tug.

### XVIII.

We find that Dow has failed to prove by a preponderance of the evidence that

failure to have a lookout aboard the tug rendered the THOMAS ALLEN unseaworthy. There is no evidence to indicate that Quarantine Bay was either a clear or a muddy body of water, nor was any evidence introduced to show that had a lookout been posted, the pipelines could be seen under the water.

Even Richard testified that he didn't see anything which would indicate an underwater obstruction.

### XIX.

Since no evidence was introduced at the trial to the contrary, we find that the Barge 19–10 was in all respects seaworthy.

### TOWAGE CONTRACT

### XX.

Under the terms of the towage contract,[18] Pitre & Guidry agreed to furnish hull and P & I insurance, including tower's liability and excess coverages on the THOMAS ALLEN, naming Dow an additional insured therein. An indemnity provision running from Pitre & Guidry in favor of Dow is contained therein, which Pitre & Guidry agreed to insure by a comprehensive liability insurance policy covering bodily injury and property damage, naming Dow as an additional insured.[19]

### XXI.

We find that under the terms of the towing contract, although Pitre agreed to indemnify Dow against all claims for personal injury and property damage arising out of the towage of *Barge 19–10*, it did not contract to indemnify Dow against its own negligent conduct.[20]

---

18. Exhibit Dow 11.

19. Sec. 6 of the Contract provides: "Contractor agrees to indemnify Dow and hold it harmless from and against all . . . claims, demands, causes of action, suits or other litigation (including the defense thereof and payment of any judgment rendered in any such action) arising out of personal injury, including . . . damage to property and occurring, incident to or arising out of the work performed

by Contractor hereunder except that in no instance shall Contractor be held responsible for personal injury including . . . damage to property attributable to the sole negligence of Dowell, its agents, employees, representatives or subcontractors; . . . "

20. Exhibit Dow 11. Under Section 6, Pitre agreed to indemnify Dow and hold it harmless against all claims (including the defense thereof and payment of any judg-

INSURANCE

## XXII.

At all times material hereto, defendant, Fireman's Fund had in effect a policy of employers liability coverage, insuring Dow. This policy contained a maritime endorsement providing coverage for claims by members of the crews of vessels with limits of $500,000.[21]

## XXIII.

At all times hereto, defendant New York Underwriters had in effect a policy of insurance issued to Pitre & Guidry covering the hull and tower's liability of the THOMAS ALLEN and the protection and indemnity risks of Pitre & Guidry as owner of the THOMAS ALLEN.[22] This policy had limits of $45,000. hull, $45,000. P & I and one single limit, aggregate excess of $55,000. Although Dow was named as an additional insured, under the terms of the policy the assurer was liable to pay to its assured only those losses or damage for which the insured became legally liable as owner of the vessels named in the policy. Although the THOMAS ALLEN was a named vessel, the *Barge 19–10* was not. The court finds that this policy afforded no coverage to Dow as owner of the *Barge 19–10*, nor as a service company conducting operations in the offshore oil fields of Louisiana.[23]

Under the terms of this policy, contractual liability was specifically excluded.[24]

Under the tug hull endorsement of the policy, if the THOMAS ALLEN caused any loss or damage to her tow and the insured shall become liable to pay damage to any other persons, the insurer was liable to pay such proportion of such sum as the insurer's subscriptions bore to the value of the THOMAS ALLEN.[25]

## XXIV.

At all times material hereto, defendant, Utica Mutual, had in effect a policy of excess insurance issued to Pitre,[26] providing excess protection and indemnity and excess tower's liability insurance, with limits of $150,000. Dow is also a named assured in this policy but, again, the policy provisions offer coverage to Dow only for its liability vis-a-vis the tug.

CONCLUSIONS OF LAW

### I.

The Court has jurisdiction of this case and venue is proper.

### II.

■■ While a tug is not the insurer of its tow,[27] generally speaking a tug which is solely in command of her flotilla, especially where her tow is non-self propelled and unmanned, is responsible for the safe navigation of the flotilla; and she has the duty to exercise such reasonable care and skill as prudent navigators would exercise under similar cir-

---

ment rendered) arising out of personal injury, including damage to property and occurring, incident to or arising out of the work performed by Pitre, except that Pitre shall not be held responsible for personal injury and property damage attributable to the sole negligence of Dow.

21. Policy WP–115 95 00.

22. Policy OM 43 43–07–96, Exhibit Dow 9.

23. Exhibit Dow 9, Page 2, reads as follows: " . . . The assurer hereby undertakes to make good to the assured . . . all such loss and/or damage . . . *as the assured shall as owners of the vessel named herein* have become liable to pay . . . " Emphasis added.

24. Exhibit Dow 9, Page 2, Section 5 provides: coverage for "Liability for loss of or damage to any other vessel . . . not caused by collision, provided such liability does not arise by reason of a contract made by the assured."

25. Exhibit Dow 9, Par. 23.

26. Certif. No. 42986, Exhibit Dow 10.

27. Stevens v. White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932); A. E. Staley Mfg. Co. v. Porto Rico Lighterage Co., 323 F.Supp. 27 (E.D.La.1970), aff'd 438 F.2d 1 (CA5–1971).

cumstances.[28] She is charged with knowledge of navigational conditions, including knowledge of channels, depth of water, obstructions, pipelines and other dangers to her tow.[29]

### III.

However, if a tug tows a vessel which is in her charge through dangerous conditions without any consultation with the vessel's owner, the tug and her owners are solely responsible for damage to the vessel but if she tows the vessel with the consent of the vessel's master or owner, the tug and her owners will be liable for one half.[30]

### IV.

The general rule is that, in the absence of an agreement to the contrary, when the tug supplies the motive power she becomes the dominant mind, and the tow is required to follow directions from the tug. A different arrangement may be made by agreement, expressed or implied from the circumstances. If the tow is the "dominant mind", the tug is not liable provided the tug has obeyed the tow's orders and has not herself been guilty of negligence, either in the manner of executing the orders or by participating in an obviously dangerous maneuver.[31]

### V.

The Court concludes that the two proximate causes of the casualty were (1) the negligent insistence of those in charge of *Barge 19–10* that the flotilla proceed to Williams Rig No. 7 when they knew that no pipeline charts or guide boats were available and that Captain Plaisance had no knowledge of the location of these pipelines, and (2) the negligence of Captain Plaisance in the actual conduct of navigating the flotilla through Quarantine Bay without a guide boat or a chart. His decision to follow orders was unjustified in light of the dangers involved.[32]

### VI.

The testing of a known danger is inconsistent with reasonably prudent navigation.[33]

"This was not a voyage of exploration seeking a route around Cape Horn or through the Northwest Passage, where a venturesome admiral might risk life and vessel for a taste of glory; . . ."[34]

It was a tow across a shallow bay filled with unmarked pipelines, to deliver a workover barge to a rig.

### VII.

Although lack of a depth finder or a lookout may render a vessel unseaworthy, the Court concludes that under the facts and circumstances of this case, insufficient evidence was introduced to support a finding that lack of a depth finder or a lookout posted

28. Stevens v. White City, *supra;* Dixon Chemical Ind., Inc. v. Vincent C. Turecano, Inc., 417 F.2d 619 (CA2–1969); Hart v. Blakemore, 410 F.2d 218 (CA5–1969).

29. Humble Oil & Refining Co. v. Tug Crochet, 288 F.Supp. 147 (E.D.La.1968), aff'd 422 F.2d 602 (CA5–1970).

30. Monk v. Cornell Steamboat Co., 198 F. 472 (CA2–1912); The Packer, 28 F. 156 (C.C.1886); McWilliams Transit Inc. v. The Gerd H. Henjes, 50 F.Supp. 159 (E.D.N.Y.1943).

31. The Fort George, 183 F. 731 (CA2–1910); Griffin On Collision, p. 414; Sturgis v. Boyer, 24 How. (65 U.S.) 110, 16 L.Ed. 591 (1871); The Stella, 278 F. 939 (CA5–1922); Great Lakes Towing Co. v. American SS Co., 165 F.2d 368 (CA6–1948).

32. Guillory v. Ocean Drilling & Exploration Co., 433 F.2d 833 (CA5–1970); Matter of Complaint of Seaboard Shipping Corp., 449 F.2d 132 (CA2–1971); Houma Well Service, Inc. v. Tug Capt. O'Brien, 312 F.Supp. 257 (E.D.La.1970).

33. Philadelphia Elec. Co. v. Curtis Bay Towing Co. of Pa., 260 F.Supp. 505, aff'd 390 F.2d 125 (CA3–1968).

34. Matter of Complaint of Seaboard Shipping Corp., *supra.*

## 1364

aboard the tug was the proximate cause of the casualty.[35]

### VIII.

 Although sailing without a chart may render a vessel unseaworthy,[36] the Court concludes that under the facts of this case, failure of Pitre & Guidry to have charts of the pipeline locations aboard the tug was not the proximate cause of the casualty.

### IX.

 Where the master of the tug and owners of the barge, through her employees, were both guilty of negligence and the fault of each was a direct legal cause of the personal injuries sustained by Brown as well as the physical damage to the barge, contribution is allowed and damages may be equally divided.[37]

### X.

The Court concludes that the owner of the Tug THOMAS ALLEN was without privity or knowledge of Captain Plaisance's negligence and are thus entitled to limit its liability to the value of its interest in the vessel and her freight then pending. In this case, the emergency was met by the master of the vessel alone. There was no opportunity to consult or to bring the proposed action of the master to the owner's knowledge.[38]

### XI.

 Indemnity is only available in favor of one who is passively, vicariously or secondarily at fault against a party whose active or primary negligence causes the injury or damage upon which recovery is predicated. Where both parties are guilty of active proximate negligence, they are not entitled to indemnity.[39]

### XII.

 The Court concludes that the negligence of Dow was a direct cause of the casualty in question and thus it is not entitled to indemnity on its cross-claim, either in tort or in contract. Unless the intention is unequivocally expressed, the law will consider that parties to a contract did not undertake to indemnify one against the consequence of his own negligence. The court concludes that Pitre & Guidry did not contract to indemnify Dow for Dow's own negligence.[40]

### XIII.

 The insurance afforded by Fireman's Fund Insurance Company clearly applies to the liability for the personal injuries sustained by Louie Ray Brown.

### XIV.

 Although the tug's P & I policy names Dow as an additional assured, the

35. Russell, Poling & Co. v. Conners Standard Marine Corp., 252 F.2d 167 (CA2–1958); See The M/S Bella Dan, 1967 AMC 2295 (E.D.Va.1967).

36. DeBardeleben Marine Corp. v. United States, 451 F.2d 140 (CA5–1971).

37. Horton v. Dyer, 428 F.2d 1131 (CA5–1970); Watz v. Zapata Off-Shore Co., 431 F.2d 100 (CA5–1970); Bilkay Holding Corp. v. Consol. Iron & Metal Co., Inc., 330 F.Supp. 1313 (S.D.N.Y.–1971); See Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge or Vessel Mr. Charlie, 294 F.Supp. 1025 (D.C.), rev. 424 F.2d 684 (CA5–1970); White Oak Transp. Co. v. Boston, Cape Cod & New York Canal Co., 258 U.S. 341, 42 S.Ct. 338, 66 L.Ed. 649 (1922).

38. See Findings of Fact, footnote 27; 46 U.S.C. § 183; La Bourgogne, 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973 (1908); See The Linseed King, 285 U.S. 502, 52 S.Ct. 450 (1932) at pp. 452–453, 76 L.Ed. 903; American Tobacco Co. v. The Katingo, 81 F.Supp. 438 (S.D.N.Y.1948).

39. Grigsby v. Coastal Marine Serv., 412 F.2d 1011 (CA5–1969), cert. dis. Fidelity & Cas. Co. v. Grigsby, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531; Acme Boat Rentals, Inc. v. J. Ray McDermott & Co., 424 F.2d 393 (CA5–1970); In re Standard Oil Co. of Cal., 325 F.Supp. 388 (D.C. Cal.–1971).

40. United States v. Seckinger, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970); Transcontinental Gas Pipeline Corp. v. Mobile Drill Barge Mr. Charlie, 424 F.2d 684 (CA5–1970); Tri-State Oil Tool Industries, Inc. v. Delta Marine Drilling Co., 410 F.2d 178 (CA5–1969); Gorsalitz v. Olin Mathieson Chemical Corp., 429 F.2d 1033 (CA5–1970); In re Tidewater Oil Co., 321 F.Supp. 14 (E.D.La.–1970).

coverage afforded thereunder is limited to the assured's liability "in respect of" the insured vessel, i. e., the Tug THOMAS ALLEN. Dow, therefore, is afforded no coverage under this policy except with respect to fault on the part of the THOMAS ALLEN or the negligence of her crew. Dow's liability in this case arises from its negligence as a barge owner, or more importantly, a service company anxious to perform services for its customers without a delay. No such coverage was provided by New York Underwriters Insurance Company or Utica Mutual Insurance Company, Pitre & Guidry primary and excess P & I underwriters, respectfully.[41]

#### XV.

Should the parties be unable to agree on the extent of plaintiff Dow's provable damages, the Court, upon application of one of the parties, will appoint a Magistrate to determine damages.

#### XVI.

Let judgment be entered in Civil Action 71–530 in favor of plaintiff, Louie Ray Brown and against defendant, The Dow Chemical Company, Inc., and its insurer Fireman's Fund Insurance Company and defendants Pitre & Guidry Towing Co., and its insurers New York Underwriters Insurance Company and Utica Mutual Insurance Company, in the sum of $168,750.00 with interest at the legal rate to run beginning 30 days from April 14, 1972.

#### XVII.

Let judgment be entered in Civil Action 71–530 in favor of defendants, Pitre & Guidry Towing Co., Inc., New York Underwriters Insurance Company and Utica Mutual Insurance Company dismissing the cross-claims of defendants, The Dow Chemical Company, Inc. and Fireman's Fund Insurance Company for indemnity.

#### XVIII.

Let judgment be entered in Civil Action 71–530 in favor of The Dow Chemical Company, Inc. and Fireman's Fund Insurance Company and against defendants, Pitre & Guidry Towing Co., Inc., New York Underwriters Insurance Company and Utica Mutual Insurance Company for one half of all maintenance and cure payments paid to or on behalf of plaintiff.

#### XIX.

Let judgment be entered in Civil Action 71–526 in favor of The Dow Chemical Company, Inc., and against the Tug THOMAS ALLEN, *in rem*, and Pitre & Guidry Towing Company, *in personam*, and its insurers New York Underwriters Insurance Company and Utica Mutual Insurance Company for one half of the damages sustained by them as a result of the fire aboard the *Barge 19–10*, with interest from date of judgment.

41. Lanasse v. Travelers Insurance Co., 450 F.2d 580 (CA5–1971).