**MARATHON PIPE LINE COMPANY**

v.

**DRILLING RIG ROWAN/ODESSA, et al.**

**Civ. A. No. 79-403.**

United States District Court,
E. D. Louisiana,

Nov. 30, 1981.

Henry J. Read, Trial Atty., A. Gordon Grant, Jr., Montgomery, Barnett, Brown & Read, New Orleans, La., for plaintiff.

Alan A. Zaunbrecher, James E. Blazek, Adams & Reese, E. A. Carrere, Jr., James E. Wright, III, Jones, Walker, Poitevent, Carrere, Denegre, New Orleans, La., for Rowan Companies.

George W. Healy, III, Richard N. Dicharry, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Twenty Grand & Tidewater.

John W. Waters, Jr., P. A. Bienvenu, Hugh M. Glenn, Jr. Bienvenu, Foster, Ryan & O'Bannon, New Orleans, La., for Sun Oil & Sun Gas.

Charles M. Steen, Trial Atty., Robert W. Booksh, Jr., Liskow & Lewis, New Orleans, La., for J. Chance.

## OPINION

ARCENEAUX, District Judge.

Plaintiff, Marathon Pipe Line Company ("Marathon"), owner of an eight-inch oil pipeline installed on the floor of the Gulf of Mexico, has brought this suit in admiralty seeking compensation for damage sustained by a portion of the pipeline on August 5, 1978. Defendants are the Drilling Rig ROWAN ODESSA ("ROWAN ODESSA"), *in rem*, and its owner, Rowan Companies, Inc. ("Rowan"), the Tugs EL ZORRO GRANDE ("EL ZORRO"), EL JAGUAR GRANDE ("EL JAGUAR"), LEOPARDO GRANDE ("LEOPARDO"), *in rem*, their owner, Twenty Grand Offshore, Inc. ("Twenty Grand"), their operator, Tidewater Marine Service, Inc. ("Tidewater"), Sun Oil Company ("Sun Oil"), Sun Gas Company ("Sun Gas"), and John E. Chance & Associates, Inc. ("Chance").

Defendants deny liability. Defendants Sun Oil and Sun Gas have cross-claimed against all of the defendant vessels and the other defendants. Defendants Twenty Grand and Tidewater have cross-claimed against defendants Chance and Rowan. Defendant Rowan has cross-claimed against the three defendant tugs, Chance, Twenty Grand, Tidewater and Sun Oil. Defendant Chance has cross-claimed against all defendant vessels and all other defendants.

The matter came on for trial on January 14, 1981, and considered solely the issue of liability; the issue of quantum was reserved. The parties filed post-trial briefs, and the matter was taken under submission. Having thoroughly reviewed the evidence, the memoranda filed by counsel, and the applicable law, the Court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### 1.

At all times pertinent, plaintiff Marathon, a corporation organized under the laws of the State of Delaware, was the owner of an all-welded, seamless, eight-inch diameter submerged oil pipeline. This pipeline ran in a northeast direction, between the Sun Oil "A" platform in East Cameron Block 338 and the Marathon "A" platform in East Cameron Block 321. It extended a distance of 7.34 miles and was constructed and installed on the floor of the Gulf of Mexico in accordance with all permits required by law. The water depth at the northern end of the pipeline ("Block 321") was approximately 210 feet and at the southern end ("Block 338") was approximately 260 feet.

### 2.

At all times pertinent, defendant Sun Oil was a corporation organized under the laws of the State of Delaware and, on August 4, 1978, was the operator of a lease in East Cameron Block 331. However, Sun Oil had previously obtained the necessary rights to directionally drill a well from East Cameron Block 330 into Block 331 at a proposed

location approximately 1500 feet to the east of the Marathon pipeline since the East Cameron Block 331 location was within a shipping fairway.

3.

On July 31, 1978, Sun Oil contracted with Rowan, a corporation organized under the laws of the State of Delaware, to furnish the ROWAN ODESSA to drill the proposed well. The contract between the parties was prepared by Rowan.

4.

Under the terms of its contract with Rowan, (entitled "Agreement"), Sun Oil agreed to: provide Rowan with a "guide-path" and access to the drillsite location, advise Rowan of any subsurface conditions or obstructions which Rowan might encounter during operations under the agreement, survey and mark locations, and provide towing service.

5.

The contract between Sun Oil and Rowan contained, among others, the following provisions:

8. (b) *Operator of Drilling Unit.*

Contractor shall be solely responsible for the operation of the Rig, including, without limitation, supervising moving operations, positioning on drilling locations as required by Operator, jacking up and jacking down operations, as well as such operations on board the Rig as may be necessary or desirable for the safety of the Rig. Operations under this Agreement will be performed on a 24-hour day basis.

9. (f) *Indemnity Provisions.*

(1) *Contractor's [Rowan's] Indemnification of Operator [Sun].*

Contractor agrees to protect, defend, indemnify and save Operator and its joint owners harmless from and against all claims, demands and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party, arising in connection herewith in favor of Contractor's employees, Contractor's subcontractors or their employees, on account of bodily injury, death or damage to property . . . .

(2) *Operator's Indemnification of Contractor.*

Operator agrees to protect, defend, indemnify and save Contractor harmless from and against all claims, demands and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party, arising in connection herewith in favor of Operator's employees, Operator's contractors or their employees, other than those identified in 9(f)(1) above, on account of bodily injury, death or damage to property . . .

12. *Independent Contractor.*

Contractor is an independent Contractor. Neither Contractor, its employees, subcontractors or their employees, are agents or employees of Operator. The entire performance, operations management and control of the Rig and other items of Contractor's equipment shall be under the exclusive control and command of Contractor, and shall be carried out by Contractor with the primary purpose of performing all acts necessary to execute the work required by the Operator's drilling program for each well, consistent with safety. It shall be the sole exclusive duty of Contractor to determine at all times, whether operations can be safely continued or undertaken, including, without limiting the generality of the foregoing, the duty to determine by Contractor's own inspection that all cargo and items of equipment are loaded and stored in a proper manner and the Rig is suitable to undertake any contemplated operation under the then existing conditions.

6.

In order to determine whether any underwater obstructions existed in the area, Sun Oil relied on information received from Clark Oil Company ("Clark"), which information was compiled by Clark in December of 1976. Sun Oil provided Rowan with a map showing the as-built location of the pipeline; however, the map was lost prior

to trial and was never admitted into evidence. Sun Oil engaged the services of Chance to survey and mark the drilling location. In addition, prior to the arrival of the ROWAN ODESSA at the drilling location, Chance, as requested by Sun Oil, placed three (3) marking buoys along the Marathon pipeline, so as to identify its location. Finally, Sun Oil, pursuant to Schedule E(2) of its agreement with Rowan, assumed the cost of the tugs engaged by Rowan to tow the ROWAN ODESSA to location.

7.

The ROWAN ODESSA is a jack-up drilling vessel, official number 579021, measuring 247 feet in length, 200 feet in width, with a hull depth of 26 feet. It has three retractable legs, 410 feet in length, which can be raised or lowered at a constant rate of 90 feet per hour.

The vessel is not self-propelled and must be towed by other vessels. When being moved, she is under the command of a Rowan employee, variously referred to as the "rig mover" or "rig manager". At all times pertinent, the rig mover was R. G. McCary.

8.

Under the terms of its agreement with Sun Oil, Rowan agreed to: carry out all operations under the agreement with due diligence, in a safe, workmanlike manner and be solely responsible for the operation of the rig, including, without limitation, *supervising moving operations, positioning on drilling locations as required by Operator, jacking-up and jacking-down operations.* (Emphasis supplied).

9.

On August 2, 1978, Rowan contacted Tidewater, requesting three tugs to tow the ROWAN ODESSA from a drillsite off of the Texas Coast to East Cameron Block 330. The towing expense was assumed by Sun Oil pursuant to its agreement with Rowan.

At all times pertinent, the three tugs towing the ROWAN ODESSA to its location in East Cameron Block 330, the EL JAGUAR GRANDE, EL ZORRO GRANDE and LEOPARDO GRANDE, were diesel-powered, documented, ocean-going vessels, owned by defendant Twenty Grand and operated by defendant Tidewater. Pursuant to the contract between Sun Oil and Rowan, and through the use of the three tugs, the ROWAN ODESSA, under McCary's command, was put under tow toward the designated drillsite on August 3, 1978.

10.

At all times pertinent, defendant Chance was a corporation organized and doing business under the laws of the State of Louisiana.

Sun Oil contracted with Chance for surveying services, and on July 28, 1978, requested that Chance buoy the drilling site. On August 4, 1978, while the ROWAN ODESSA was in tow toward the drilling location, Sun Oil also requested that Chance place marker buoys on the pipeline which was located approximately 1500 feet west of the proposed drillsite. On that date, Chance marked the well location, placed two reference buoys to the northeast and northwest of the site, and placed three buoys on the pipeline directly west of the site.

The three buoys marking the pipeline west of the wellsite were placed at 1500 foot intervals. One was placed due west of the site while the remaining two buoys were placed 1500 feet northeast and southwest of the first buoy. Subsequent surveys indicated that the wellsite and pipeline buoys were placed within expected tolerance limits. Each buoy consisted of one cubic foot piece of styrofoam, topped with an eight-foot cane pole. Attached to each pole was a six-volt battery, non-flashing bulb, and a small black and white flag.

The request to buoy the pipeline was transmitted by telephone from Sun Oil to Chance after the Chance surveyors were offshore. As a result, Chance, in its office, made the calculations necessary to locate the pipeline and radioed the information to its offshore crew.

**11.**

On board the ROWAN ODESSA during the move was Rowan rig mover, McCary, Rowan toolpusher Lindsey Rogers, Captain Dillman, the rig's marine hull underwriters' representative, Sun Oil's drilling foreman, Richard Oliver, and the Rowan crew. McCary as rig mover was in command of the vessel, while Oliver's duties involved checking the rig's inventory and equipment used for drilling. Although Oliver was responsible for seeing that the rig was properly located on the wellsite, he had nothing to do with the lowering of the rig's legs, or with moving the vessel toward location.

On or about August 2, 1978, Sun Oil obtained from Marathon a map showing the as-built location of the pipeline and its proximity to the drilling location. This map disappeared from the rig after the pipeline was damaged and was never found. It therefore was not produced for trial. On or about August 4, 1978, Sun Oil sent the map to the rig by helicopter, for use by rig personnel. This map was reviewed by McCary, Captain Dillman and Oliver, in the course of the rig move. Oliver testified that, in addition to this map, he had on board yet another chart, which also mysteriously vanished and which also showed the wellsite and its proximity to the pipeline. Oliver testified that the pipeline was shown on their maps as running from the southwest to the northeast, while Dillman and McCary testified that the pipeline appeared to run north to south.

There was considerable testimony concerning the reliance of McCary, Dillman and Oliver upon the siting of the rig inside of a "triangle", created by the Sun Oil, Marathon and Aminoil platforms. The Marathon platform in Block 321 was north of the wellsite while the Sun platform in Block 330 was southwest of the site. The Aminoil platform was located northeast of the drillsite. Oliver stated that he considered the location of these platforms as visual indicia of an imaginary "triangle" of safety. If the rig was inside of this triangle, it would not contact the pipeline.

The Court finds that the Rowan employees onboard the ROWAN ODESSA and responsible for moving the rig were well aware of the presence of the Marathon pipeline long before arriving at the proposed drillsite.

**13.**

At approximately 8:00 p. m. on August 4, 1978, the captain of the EL ZORRO GRANDE, Otis Wisdom, was contacted by McCary, who requested that the rig receive one hour's notice prior to arrival in the vicinity of the location so that the rig could begin lowering its legs. At approximately 10:30 p. m., Wisdom informed the rig that the flotilla was approximately one hour from "location", that is, from Block 330. Wisdom was also informed that the "jacking-down" rate of the rig's legs was one and a half feet per minute; he was requested to determine, from the survey boat, what the water depth was at the wellsite. The tug then relayed a depth reading, provided by the survey boat to the rig, of 255 feet. This figure is contrasted with the 249 foot reading which appeared on the Sun Oil "Drilling Program".

The lead tug decided that the flotilla would enter the block to the north, rather than directly to the west of the wellsite. Several witnesses agreed that such an approach would be customary, under these circumstances, to avoid "wiping out" the location buoy.

**14.**

Chance surveyor Caillier was aboard the Chance survey boat, GULF SURVEYOR, and in radio communication with the rig and its tug boats when the flotilla was several hours away from the wellsite. He communicated to the flotilla that a pipeline was in the vicinity of the wellsite and was told by McCary that he, McCary, was aware of the pipeline's location. He also recalls advising "someone" in the flotilla that the water depth at the wellsite was 255 feet. There was also testimony to the effect that Caillier mentioned, in radio communication to the tugs, which communication was relayed to the rig, that the rig was east of (i. e., had crossed) the pipeline.

**15.**

The gauge on the ROWAN ODESSA showing the depth to which the rig legs were extended was not in working order. McCary, using numerical markings which appear on each leg, applied a mathematical formula to determine the depth to which the legs were lowered. The ROWAN ODESSA was not equipped with a depth finder, but had, on occasion throughout the move, radioed the tug boats and requested depth readings. The tugs were equipped with fathometers.

There was considerable conflict in the testimony relative to the proper "formula" to be utilized in calculating the leg depth. Oliver testified that he didn't know how it was done; McCary testified that he had explained it to Oliver. McCary stated that one subtracted 39 feet from the number appearing on the rig legs; Dillman indicated at trial that one subtracted 28 feet, but admitted that his deposition testimony on this point was confused. McCary also stated that his mention in deposition of a 45 foot figure was "confused". He conceded, however, that assuming the legs were lowered continuously starting at 10:30 p. m., they would be at a depth, at 1:00 a. m., of 251 feet. He testified, however, that there was an interruption in the lowering process of approximately 10 minutes duration.

**16.**

Though the testimony was conflicting on this point, the Court finds that, sometime between 11:30 p. m. and 12:15 a. m. on August 4 and 5, 1978, the flotilla arrived at a location approximately one mile north of the drillsite. McCary then directed the tugs to switch their towing positions and turn the rig so that it could approach the wellsite in a backwards position, in order that the rig's keyway would be directly over the wellsite.

It was while this "turn-around" was in progress that Chance surveyor Caillier boarded the rig and again asked rig personnel Oliver and McCary if they were aware of the pipeline's location. While Caillier testified that McCary responded by saying, "Let the tugs worry about the pipeline",

Oliver testified that he did not recall McCary making this response.

**17.**

The process of lowering the legs, and the decision as to when to do so, was directed by McCary. Though again faced with much conflicting testimony, the Court finds that the leg lowering process could not have begun any later than 10:30 p: m., and, from the evidence presented, may have begun even earlier. This conclusion must result, despite the fact that the log kept by Captain Dillman indicated that the leg lowering did not begin until 11:00 p. m. This log also indicates, and several witnesses corroborated, that at 12:30 p. m., the rig legs had been extended to a depth of 247 feet. McCary testified that the legs were already extended 26 feet when the lowering process began.

Another area of inconsistent recall concerned the depth to which the legs were to be extended as the rig approached the wellsite. Those witnesses who were involved with the wellsite approach were under the impression (an impression created by McCary) that once the tug switch occurred, the legs were to be placed at, and remain, 40 feet off bottom until the rig was quite near the wellsite. Once the rig was somewhere between 200 feet and 1500 feet off the site (again, the recollection of witnesses varies), the legs were to be dropped to a distance of 10 feet off bottom. There was no clear evidence presented (indeed, no one seemed to know) exactly when this 30 foot drop occurred. Oliver and Sun Oil engineer Kathy Jo Hayes stated that they understood from McCary's comments on August 6, 1978, that the legs had remained at the 40 foot height above bottom until the rig was quite near the wellsite, but then also stated that McCary, in a confused fashion, had also mentioned lowering the legs to 10 feet off bottom once the tug switch was accomplished. At any rate, the moving log kept by Captain Dillman shows that, as of 12:30 a. m. on August 5, 1978, the legs were 10 feet off the bottom. Captain Dillman himself testified that the legs were placed 10 feet off the bottom when the rig was one

half mile from the wellsite, and that the legs were jacked down continuously once that process was begun.

18.

The gauges measuring pressure on the Marathon pipeline registered a sudden drop sometime between 12:30 a. m. and 12:55 a. m. on on August 5, 1978. The ROWAN ODESSA was the only deep draft vessel in the vicinity at this time, and there was no vessel anchored in the area.

19.

At the point of rupture, the pipeline lay in 242–245 feet of water, and was slightly more than one mile north of the wellsite. The side scan sonar studies of the pipeline conducted by Chance on August 6, 1978, as well as the observations of those divers who examined the damaged pipeline, indicate that "prints" which correlate to the position and shape of the rig legs of the ROWAN ODESSA were found on the pipeline at the point of damage. These tracks cross the pipeline in a generally northwesterly to southeasterly direction at a point between the Marathon and Sun Oil platforms slightly more than one mile north of the proposed well location.

20.

Based on strong circumstantial evidence, the Court finds from a preponderance of all the evidence that the legs of the ROWAN ODESSA struck the Marathon pipeline on August 5, 1978, causing the damage which forms the basis of this complaint.

## CONCLUSIONS OF LAW

I.

This Court has jurisdiction of this action as an admiralty and maritime claim, and venue is proper in the Eastern District of Louisiana.

II.

■ Inasmuch as Marathon's pipeline was properly laid, in accordance with required permits, Marathon is not guilty of any fault or neglect which contributed to the damage sustained by the pipeline. *Gray v. Joansson*, 287 F.2d 852 (5th Cir.

1961), *cert. denied*, 368 U.S. 835, 82 S.Ct. 61, 7 L.Ed.2d 36 (1961).

III.

In a case of this nature, where there can be no eyewitnesses to the event causing damage, the facts cannot be found with absolute certainty or beyond a reasonable doubt. The rights of the parties are determined by a preponderance of the evidence, and reliance upon circumstantial evidence which supports the inference of causation and negligence is permissible. *Petition of Potomac Sand and Gravel Co.*, 253 F.Supp. 268 (D.Md.1966); *So. Pacific v. Commercial Transport Corp.*, 1967 A.M.C. 565 (E.D.La. 1966).

IV.

■ By virtue of their agreement with Rowan, which agreement was drafted by Rowan's general counsel John Magner, Sun Oil agreed to provide Rowan with a "guidepath" and access to the drilling site. Rowan contends that Sun Oil breached this obligation as the term "guidepath" speaks for itself and is clear and unambiguous. However, at trial no one was able to clearly define the term. Magner testified that he had not placed in the contract a definition of the term and, when asked to define it, he stated he could not. The only witness at trial who attempted to define the term was Rowan's Executive Vice-President Charles W. Yeargain. His definition indicated that, between two points, there were no obstructions. Testimony at trial, however, indicated that the Gulf of Mexico has many subsurface pipelines, and it would be all but impossible to move a drilling rig within the Gulf without encountering such obstructions. Hence, it is apparent that the term "guidepath" as used in Section 4(c) of the agreement between Rowan and Sun Oil was ambiguous and did not clearly indicate the intent of the parties regarding the obligation thereunder. It follows that such an ambiguous contractual provision must be construed against the party which drafted the agreement (Rowan). *Transcontinental Gas Pipeline Corp. v. Mobile Drilling Barge MR. CHARLIE*, 294 F.Supp. 1025 (E.D.La.

1968), *aff'd in part, rev'd on other grounds*, 424 F.2d 684 (5th Cir. 1970).

Accordingly, the Court is unable to find that Sun Oil failed to fulfill its contractual duty to provide Rowan with a "guidepath" and access to the drilling site.

In addition to furnishing Rowan with a "guidepath", Sun Oil agreed to advise Rowan of any subsurface conditions or obstructions which Rowan might encounter during operations under the agreement, survey and mark locations, and provide towing service. In fulfillment of these obligations, Sun Oil provided Rowan with a map showing the as-built location of the pipeline and Sun Oil's foreman, Oliver, had yet another chart aboard the rig showing the location of the pipeline relative to the proposed drilling site. In addition, Sun Oil engaged the services of Chance to survey and mark the drilling location and, prior to the rig's arrival on location, had Chance mark the exact location of the pipeline. Finally, Sun Oil assumed the cost of the tugs which were engaged by Rowan to tow the ROWAN ODESSA to the drilling site.

█ Thus, having found that Rowan was well aware of the existence and location of the Marathon pipeline relative to the wellsite, prior to the arrival of the ROWAN ODESSA on location, the Court concludes that Sun Oil fulfilled all of its obligations under its agreement with Rowan and that Sun Oil was not negligent in the planning as opposed to the operational aspects of the rig move. *Contra, Transcontinental, supra.*

## V.

█ In the instant case, a moving vessel, the ROWAN ODESSA, collided with a fixed subsurface object, the Marathon pipeline. When a moving vessel collides with an anchored vessel or a fixed object, there is a presumption the moving vessel is at fault, and the moving vessel bears the burden of rebutting this presumption by showing that it was without fault, or that the collision was caused by the fault of the stationary object, or that it was the result of inevitable accident. *The OREGON*, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943

(1895); *The CLARITA*, 90 U.S. (23 Wall) 1, 13, 23 L.Ed. 146 (1874); *Freeport Sulphur Co. v. S.S. HERMOSA*, 1974 A.M.C. 1315, 368 F.Supp. 952 (E.D.La.1973), *aff'd in pertinent part*, 1977 A.M.C. 508, 526 F.2d 300 (5th Cir. 1976); *Transcontinental, supra.* The presumption of fault on the part of the ROWAN ODESSA in hitting the pipeline has not been overcome. Rowan, the claimant-owner of the ROWAN ODESSA, has not shown that the collision was the result of inevitable accident, nor has it shown that the collision was caused by the fault of the stationary object. The fact that the collision occurred required Rowan as owner of the vessel to show that the vessel, and those in charge of her navigation, were without fault. *Transcontinental, supra.*

Turning to the drilling vessel ROWAN ODESSA, the Court has found that the gauge on the vessel showing the depth to which the legs were extended was not in working order during the rig move. This required McCary, her master, to use numerical markings which appear on each leg, and to apply a mathematical formula to determine the depth to which legs were lowered. Also, the rig was not equipped with a fathometer which would indicate the water depth below the vessel. Thus, the rig, in order to determine the water depth, had to contact the tugs which were equipped with fathometers. However, considering the fact that the rig was being towed, and the towing hawser was approximately 1800 feet in length, the rig would only be advised as to the water depth below the tugs more than one quarter mile away. Therefore, unless the rig was constantly being advised as to the water depth, any attempt by the rig mover to extend the rig legs to a specific depth above the floor of the Gulf at any point would be based on speculation as to the actual water depth below the rig at a given time.

In considering the actions of McCary, the master of the ROWAN ODESSA, the Court concludes that he failed to fully inquire into the location of the pipeline as the rig was nearing the drilling location, notwithstanding the fact that he had in his possession a

map showing the as-built location of the pipeline and that the pipeline was marked by the Chance buoys. Testimony indicated that he relied solely upon the siting of the rig within an imaginary "triangle" created by nearby platforms, and did not take special precautions under the circumstances, such as locating the Chance marker buoys or requesting that the Chance survey vessel, the GULF EXPLORER, keep the rig advised as to the pipeline's location.

The Court finds that McCary was also negligent in failing to inquire into the depth of the water at the point where the ROWAN ODESSA crossed the pipeline, approximately one mile north of the proposed drilling location. Testimony indicated that McCary requested that the captain of the EL ZORRO GRANDE inform the rig when the flotilla was approximately one hour from location so the rig could begin lowering its legs. At approximately 10:30 p. m. the rig was so informed and, thereafter, McCary requested the EL ZORRO GRANDE to determine from the Chance survey vessel the water depth at the wellsite. McCary, however, did not request depth readings at the location where the rig began the jack-down procedure or at any location other than the wellsite, apparently assuming the depth between rig and the wellsite was the same as that at the wellsite (255 feet).

Finally, McCary was negligent in timing the lowering of the rig's legs and in not allowing a reasonable margin of safety relative to the depth to which the legs were to be lowered.

The Court has found that the pipeline lay in 242–245 feet of water at the point of rupture, which rupture occurred approximately one mile north of the wellsite sometime between 12:30 a. m. and 1:00 a. m. on the morning of August 5. Assuming that McCary began to lower the legs at 90 feet per hour at 10:30 p. m., as he testified, and that the vessel had a draft of 26 feet, the legs would, after continuous lowering, have reached a depth, at 1:00 a. m., of 244 feet. The vessel's moving log, however, indicates that, at 12:30 a. m., the legs were 10 feet off bottom at 287 feet "rack". According to Captain Dillman, the legs were then at a depth of 257 feet. Thus, although the testimony was conflicting as to the depth to which the legs were extended, in any event, the margin for safety at the point where the rig crossed the pipeline was 0, instead of the usual 10 to 15 feet.

For the reasons cited hereinabove, any of which, in the Court's opinion, constituted fault on the part of the drilling vessel ROWAN ODESSA and/or her master, McCary, the Court finds that Rowan as claimant-owner has failed to rebut the presumption that its vessel was at fault in causing the collision with the pipeline and that McCary, her master, was negligent. Accordingly, such fault on the part of the ROWAN ODESSA and those in charge of her navigation was the sole proximate cause of the damage to the Marathon pipeline.

## VI.

■ Plaintiff has named as defendants Tidewater and Twenty Grand, as owner/operator of the three vessels engaged with towing the ROWAN ODESSA to the wellsite. Based on the evidence heard at trial and the applicable law, the Court is convinced that the towing vessels were in no way a contributing proximate cause of the collision with the Marathon pipeline. Virtually every witness testified that the tugs' behavior and navigation were commensurate with that level of care and expertise required of similarly situated towing vessels. It was also generally conceded that the tugs were directed by and subject to the orders of the rig manager, McCary. While the tugs were responsible for the safe conduct of the rig over water to the wellsite, they did not control or direct the movement of the rig's legs. At all times pertinent, the tugs were operating under the direction of McCary. As a result, they cannot be considered the "dominant mind" over their tow.

The "dominant mind" concept was developed to impose liability for a collision on the towing vessel for its faults in navigation, even though the tow may have contributed

to the accident. The tug is generally considered the "dominant mind", since it provides the motive power. When, however, the collision is the result of a duty breached by the tow, and not the result of some fault or omission of the tug, the tow may be held solely liable for resulting damages. Gilmore & Black, *The Law of Admiralty* (2d Ed. 1975), p. 516; *Chevron U. S. A., Inc. v. Progress Marine, Inc.*, 1980 A.M.C. 1637, *aff'd*, 632 F.2d 893 (5th Cir. 1980). *See also Dow Chemical Co. v. Tug THOMAS ALLEN*, 349 F.Supp. 1354 (E.D.La.1972), wherein it was stated:

> If the tow is the "dominant mind", the tug is not liable provided the tug has obeyed the tow's orders and has not herself been guilty of negligence, either in the manner of executing the orders or by participating in an obviously dangerous maneuver.

*Dow Chemical, supra* at 1363.

The tugs supplied depth readings to the ROWAN ODESSA throughout most of the move. Though the testimony was somewhat unclear as to whether the tugs possessed a pipeline chart on board, it appears that they did not. While sailing without a chart may render a vessel unseaworthy, the Court concludes that under the facts of this case, the failure of Tidewater and/or Twenty Grand to supply pipeline charts to the tugs was not the proximate cause of the casualty. *Dow Chemical, supra.* Nor was the tug's relay to the rig of the Chance observation that the flotilla was east of the pipeline a proximate cause of the collision. The tugs were not requested nor under a duty to provide the rig with constant depth readings or to evaluate another party's knowledge of the flotilla's location relative to the pipeline. Rig personnel did not ask the tugs for depth readings or a navigational fix when they crossed the pipeline, as they had at other times during the move. The tugs were aware of the pipeline's presence, but, as numerous witnesses testified, the tugs were not responsible for, or in any way involved in the decision to lower the rig legs. At all times pertinent, the tugs exercised that degree of caution, care and maritime skill which prudent navigators usually employ in similar undertakings. *United States Fire Insurance Co. v. Gulf States Marine & Mining Co.*, 262 F.2d 565 (5th Cir. 1959); *Chitty v. M/V VALLEY VOYAGER*, 284 F.Supp. 297 (E.D.La.1968).

## VII.

■ Plaintiff has also named as defendant Chance, the surveyor engaged by Sun Oil to buoy both the drilling location and the Marathon pipeline. Based on the testimony at trial, the Court concludes that Chance performed those services requested of it under its contract with Sun Oil in accordance with the "highest standards" in the industry. The services requested of it were: 1) to buoy the location of the well, and 2) to mark the Marathon pipeline west of location. The surveys undertaken subsequent to the pipeline rupture indicated that the three buoys placed over a 3000 foot area west of the location were placed over the pipeline. The buoy marking the wellsite location was also accurately placed.

It is clear from the testimony at trial that those aboard the rig did not expect the surveyor to "direct" the rig onto location, or to mark the pipeline at the point of crossing. In addition, there was much testimony indicating that the "missing map" aboard the rig was marked to show the three points at which the Chance buoys designated the pipeline. Caillier, the Chance surveyor, when requested by Rowan, provided the rig with the water depth at location. He was not, however, requested to determine the depth at the point where the rig crossed the pipeline.

Thus, Chance, as a service company, did what it was asked to do. It was not required or under a duty to warn an experienced contractor, such as Rowan, of dangers which Rowan could be presumed to be familiar with, especially in light of Rowan's knowledge of the existence of the pipeline. *Waterbury v. Byron Jackson, Inc.*, 576 F.2d 1095 (5th Cir. 1978). Further, any negligence which the Chance crew may have committed was not a proximate cause of the damage to the pipeline. McCary's reliance upon a comment radioed by Caillier

to the tug boats and which was relayed to McCary, to the effect that the rig was east of the pipeline, was misplaced. Notwithstanding this comment, however, it was the leg lowering process directed by McCary and prior to the Chance comment which ultimately caused the damage to the pipeline. Caillier asked rig personnel on at least two different occasions whether they were aware of the existence of the pipeline. The responses were affirmative and rig personnel requested no additional assistance.

### VIII.

The court has reviewed the numerous allegations made by Rowan as to the fault of defendants and cross-defendants, Twenty Grand, Tidewater and Chance. However, such allegations have been found to be without merit.

Thus, having determined that Rowan was negligent and that such negligence was the proximate cause of the damage to the Marathon pipeline, the Court now focuses on Rowan's claims for indemnity.

### IX.

█ In the contract between Sun Oil and Rowan, the indemnity provision appearing in Section 9(f)(2) (see Findings of Fact) provides that the Operator (Sun Oil) will indemnify Contractor (Rowan) against all claims arising *"in favor of Operator's employees, Operator's contractors or their employees, . . . on account of bodily injury, death or damage to property"*. (Emphasis supplied). Since the Court has determined that Rowan is the only party whose negligence caused the damage complained of, and since the claims of Tidewater, Twenty Grand and Chance for indemnity were premised upon the possibility that they might also be found negligent, the Court finds these provisions inoperable. Further, the indemnity provision clearly does not apply to any claim by Rowan for indemnity from Sun Oil based upon the negligence of Rowan. Finally, the contract and indemnity provisions are silent as to indemnity in the event of damage to the property of third parties, such as Marathon. Thus, the Court concludes that Rowan is not entitled to indemnity from Sun Oil pursuant to their contractual obligations.

### X.

Rowan argues that it may claim indemnity from Chance under the terms of the following indemnity provision contained in the contract between Sun Oil and Chance:

INDEMNITY: Contractor [Chance] agrees to protect, defend, indemnify and hold Sun [Sun Oil] and *those who are joint adventurers, partners, co-owners of the property, or otherwise associated with Sun in receiving the benefits of the work or services to be rendered or performed hereunder,* and the employees of Sun and of such associates of Sun, free and harmless from and against any and all claims, demands and causes of action of every kind and character from any cause whatsoever by any party hereto, any party acquiring any interest hereunder, any of their agents and employees, and any third or other party whomsoever, or governmental agency, arising out of, incident to, or in connection with this agreement or performance of work or services thereunder or breach of the terms thereof, including without limitation by enumeration all taxes, claims, debts, fines, penalties, forfeitures, patent infringements, loss of use, death, injury and damages to all persons and property, together with the amount of judgments, penalties, interest, court costs, legal and other fees and expenses in connection therewith, regardless of whether the liability therefor is based upon some alleged act or omission of Sun or of Contractor or of some other party.

(Emphasis supplied).

█ Specifically, Rowan argues that it may claim indemnity from Chance as one who received "benefits of the work or services to be rendered or performed hereunder". The Court rejects this contention. The obligation to indemnify is to be strictly construed, and the status of indemnitee is also interpreted narrowly. *Gulf Oil Corp. v. Mobile Drilling Barge or Vessel Margaret,* 441 F.Supp. 1 (E.D.La.1975), aff'd, 565 F.2d 958 (5th Cir. 1978). Additionally, an indem-

nity agreement will be held to benefit a particular party only when it is express in that effect, and reflects the clear intent of the parties. *Day v. Odeco*, 353 F.Supp. 1350 (E.D.La.1973). The Court is not convinced that the above-quoted language expresses the clear intent of the parties [Sun Oil and Chance] to indemnify a contractor such as Rowan for its [Rowan's] own negligence. Rather, the provision when taken as a whole indicates that the phrase "those ... otherwise associated with Sun in receiving the benefit..." would include those persons associated or affiliated with Sun Oil enjoying the benefit of the work being performed rather than the contractors such as Rowan who are actually performing the work contracted for. Thus, the Court concludes that Rowan is not entitled to indemnity from Chance pursuant to the contract between Sun Oil and Chance.

Accordingly, IT IS ORDERED that judgment be entered in accordance with this opinion in favor of plaintiff, Marathon Pipe Line Company, and in favor of defendants, Sun Oil Company, Sun Gas Company, John E. Chance and Associates, EL ZORRO GRANDE, EL JAGUAR GRANDE, LEOPARDO GRANDE, *in rem*, Twenty Grand Offshore, Inc., and Tidewater Marine Service, Inc., *in personam*, and against defendant ROWAN ODESSA, *in rem*, and Rowan Companies, Inc., *in personam*. All cross-claims are hereby dismissed, with the amount of damages to be established by Marathon at a subsequent trial of that issue, if parties are unable to stipulate to same.