**DOMINION TERMINAL ASSOCIATES,**
**Plaintiff,**

v.

**M/V CAPE DAISY, et al., Defendants.**

**Civil Action No. 2:98CV467.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Sept. 4, 1998.

Lee Allen Handford, McGuire, Woods, Battle & Boothe, Norfolk, VA, Carter Branham Snow Furr, McGuire, Woods, Battle Boothe, Norfolk, VA, Mark Steven Davis, Carr & Porter, LLC, Portsmouth, VA, Fred Bradford Stillman, McGuire, Woods, Battle & Boothe, LLP, Norfolk, VA, for Dominion Terminal Associates.

Carter T. Gunn, Vandeventer, Black, Meredith & Martin, Norfolk, VA, Mark T. Coberly, Vandeventer, Black, Meredith & Martin, Norfolk, VA, for M/V Cape Daisy, Shinken Trading Panama Corp.

David Neil Ventker, Huff, Poole & Mahoney, P.C., Virginia Beach, VA, for McAllister Towing & Transportation Company, Inc., McAllister Towing of Virginia, Tug Nancy McAllister, Tug Brent McAllister, Charles L. Roughton.

## ORDER AND OPINION

DOUMAR, District Judge.

This matter concerns the responsibility of a docking pilot in docking a ship at a pier. The Defendant Charles L. Roughton has filed a cross-claim against Defendants M/V Cape Daisy and Shinken Trading Panama Corporation in which he asserts that, by virtue of a "pilot's exculpatory clause," he is not liable to Defendants for ordinary acts of negligence while serving as a docking pilot on the Cape Daisy. Moreover, Defendant Roughton contends that such an exculpatory provision creates an indemnity right against Defendant M/V Cape Daisy and a right to all liability insurance carried by the vessel.

This matter is before the Court on Defendant M/V Cape Daisy's motion to dismiss the cross-claim of Defendant Charles L. Roughton for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because parties referred to matters outside the pleadings, the motion has been converted into a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. In response, Defendant Charles L. Roughton has filed a cross-motion for summary judgment. For the reasons cited below, Defendant M/V Cape Daisy's motion for summary judgment is DENIED, and Defendant Charles L. Roughton's cross-motion for summary judgment is GRANTED.

## I. Background

In the shipping industry in this port, when a shipowner seeks to procure docking services at a seaport, the time-honored custom is to have the ship's authorized agent contact appropriate parties to obtain such services. At most facilities, the agent directly contacts the docking pilot and also the tug boat provider for tug services. However, at the pier operated by the Plaintiff, Dominion Terminal Associates (DTA), parties engage in a somewhat different course of dealing. When docking at the DTA pier, a ship's agent routinely calls for tug services, and the tugging service itself will contact a docking pilot for docking assistance. Under this arrangement, the authorized agent for a ship knowingly acknowledges and accepts the procurement of docking pilot services made through the tug company, primarily because those services are provided at a substantial discount. Indeed, the customary procedures for obtaining docking assistance at the DTA pier are well-understood by all involved parties. Like other ship agents, the authorized agent for the Defendant, the Cape Daisy, has known about this course of dealing at the DTA terminal. And, like other ship agents, Cape Daisy's port agent has engaged in the

same course of dealing when the same ship, the Cape Daisy, visited the DTA Terminal in Newport News, Virginia on eighteen (18) separate occasions dating back to 1986.[1]

Therefore, on the date of the accident, March 28, 1997, Cape Daisy's agent contacted the tugging service TMR Towing, Inc. or McAllister Towing of Virginia for docking assistance well-knowing the terms of providing the service. Responding to that call, the tugging service dispatched the tugboats NANCY MCALLISTER and BRENT MCALLISTER for towing assistance. The tugging company also contacted the Defendant, Captain Charles L. Roughton, to serve as the docking pilot aboard the Cape Daisy. After the allision, Captain Roughton presented the Master of the Cape Daisy with a McAllister towage ticket labeled "Receipt for Tug Services". The towage ticket for tug services also contained an exculpatory clause routinely used and referred in the industry as a "pilotage clause". Captain Roughton also presented a pilot's ticket containing a "pilot's exculpatory clause". The "pilot's exculpatory clause" appeared as follows:

PILOT NOT TO BE HELD PERSONALLY RESPONSIBLE—The services of the pilot while participating in directing the navigation of a vessel from on board such vessel or from elsewhere are accepted on the understanding that *neither the owners nor the operators of a vessel* making use of or having her own propelling power *will assert any personal liability to respond in damages,* including any rights over, *against the pilot* for any damage sustained or caused by the vessel, *even though resulting from the pilot's negligence.* In respect to the giving of orders to any of the tugs furnished to or engaged in the assisting services and/or in respect to the handling of such vessel; excepting, however, the personal liability or rights over against the pilot for his willful misconduct or gross negligence.

The Master on board the Cape Daisy endorsed both the towing ticket and the pilotage ticket. On the respective tickets, however-

er, the Master wrote in his own handwriting that he held the tug boats and the pilot responsible for the allision. Prior to this occasion, this particular Master on board the Cape Daisy had not signed any receipts for tug services at the DTA terminal. Even so, past captains of the Cape Daisy have routinely signed pilot's tickets at the DTA terminal. In fact, such exculpatory provisions in pilotage tickets and towing tickets are proffered in the ordinary course of shipping business.

The Cape Daisy and the other Defendants vigorously disagree about the employment status of Captain Roughton at the time of the allision. What this disagreement is really about is whether the Cape Daisy entered into a contract with Captain Roughton for docking pilot services. In seeking to deny the existence of a contract, the Cape Daisy argues that Captain Roughton was not employed by McAllister Towing or TMR Towing but rather was an employee and owner of Independent Docking Pilots, Incorporated. The Cape Daisy asserts that the ship entered into a contract with McAllister, and only McAllister bargained for docking pilot services with Independent Docking Pilots.

According to the Cape Daisy, McAllister or TMR made all the pilot arrangements with Independent Docking Pilots, and it was Independent Docking Pilots who billed McAllister and received payment from McAllister. The Cape Daisy states that when Captain Roughton presented the Cape Daisy's Master with a receipt for tug services from McAllister, that receipt contained only a McAllister pilotage clause and not a pilot's exculpatory clause. The Cape Daisy admits, however, that the Master was also presented with a receipt for pilot services that contained an Independent Docking Pilots pilot exculpatory clause. But the ship argues that such a clause should not be integrated into any contract between the Cape Daisy and McAllister. In other words, notwithstanding the established course of dealing among the parties at the DTA pier, the Cape Daisy believes

---

**1.** At all relevant times, the Cape Daisy's agent has been the ship's authorized agent at the DTA terminal.

that there is no privity of contract between the ship and Captain Roughton.[2]

## II. Analysis

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). For evidence to present a "genuine" issue of material fact, the evidence must be "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Facts are deemed material if they might affect the outcome of the case. *Id.*

The Supreme Court has upheld the validity of pilotage clauses as binding upon parties to a towing contract. *See Sun Oil Co. v. Dalzell Towing Co.*, 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932). Since the *Sun Oil* decision, numerous courts have exempted tugboat companies from liability for the ordinary negligence of an employee serving as a pilot of the towed vessel. *See Reederei Franz Hagen v. Diesel Tug RESOLUTE*, 400 F.Supp. 680 (D.Md.1975). Under this so-called "borrowed servant" doctrine, a tugboat master is presumed to be an employee of the shipowner. *Id.* at 684. In that sense, a shipowner must obtain liability insurance to protect itself from potential damage. *Id.*

The economics of the shipping industry show the reasonableness of this result. The potential liabilities to tugboats in assuming responsibility for navigating or piloting a ship are huge. *Reederei*, 400 F.Supp. at 685. Yet the rates charged by tugboats for providing docking assistance are comparatively small. *Id.* Therefore, the customary practice that has evolved in the shipping industry benefits both sides. In consideration for nominal docking rates, the shipowners acknowledge and accept that a ship retains the risk of loss for the foreseeable consequences of using docking services. *Id.*

Such economic circumstances are no different where a docking pilot is retained to provide assistance in docking a ship. *Reederei*, 400 F.Supp. at 689. A docking pilot simply cannot afford to carry liability insurance for negligent acts committed while docking or undocking vessels. *Id.* Still, the potential liability he faces is vast in the brief time the vessel is under his supervision. *Id.* As a result, a docking pilot ordinarily tenders a pilotage ticket to a shipowner or agent containing a "pilot's exculpatory clause". Shipowners routinely accept such provisions as consideration for cheap docking services.

■] In this case, the authorized agent for the Cape Daisy engaged in a course of dealing that establishes an implied contract for docking pilot services. The authorized agent for the Cape Daisy has bound the shipowner to the terms of that implied contract. Indeed, the Cape Daisy's authorized agent routinely contacts a tugging service directly in undertaking to obtain docking pilot services at the DTA terminal. The ship has visited the DTA Terminal in Newport News, Virginia on eighteen (18) separate occasions dating back to 1986. At all relevant times, moreover, the Cape Daisy's agent has been its authorized agent at the DTA terminal. When on March 28, 1997, the Cape Daisy's authorized agent contacted TMR Towing, Inc. or McAllister Towing of Virginia for docking assistance, the agent understood perfectly that he was bargaining to contract for tugging service and a docking pilot solicited by the tug company under the usual terms and conditions.[3]

In contacting the tug company, the shipping agent for the Cape Daisy was well aware that a docking pilot normally tenders a pilotage ticket for the Master's signature. To be sure, captains of the Cape Daisy have

---

**2.** The Cape Daisy further contends that the pilotage clause from Independent Docking Pilots, Inc's pilotage receipt is "garbled" and contains a meaningless sentence fragment.

**3.** Put another way, if the authorized agent asks for green eggs and ham, then the ship will get green eggs and ham. The ship may not like them, Sam–I–Am. The Ship may not like green eggs and ham. The ship may not like them here or there. The ship may not like them anywhere. But the Ship will try them, Sam–I–Am, when the ship's agent asks for green eggs and ham. *See generally* Theodore Seuss Geisel (Dr. Seuss), *Green Eggs and Ham* (1960).

been presented with pilotage tickets before when docking the Cape Daisy at the DTA terminal. On the day of the accident, Captain Roughton presented a pilotage ticket containing a "pilot's exculpatory clause" to the Master of the Cape Daisy for his signature. Like those captains before him, the Master of the Cape Daisy endorsed the pilotage ticket proffered by Captain Roughton.

In so doing, the Cape Daisy benefited from nominal pilot charges. Indeed, in comparison with other ports, docking pilot rates at the DTA pier are discounted even more. On the date of the accident, the charge for Captain Roughton's services was $206. At other terminals, docking pilots charge almost twice that amount, but that is still not nearly enough to cover the cost of insuring the pilot against liability. Undoubtedly, ship owners make the choice where to dock their vessels based on the economics of the situation. In choosing to dock at the DTA terminal, the Cape Daisy is able to procure beneficial docking pilot rates. If Captain Roughton could be held liable for upwards of $1.5 million for docking pilot services invoiced at $206, the increase in docking fees occasioned by such a legal precedent would be financially intolerable to ships. Furthermore, as a practical matter, the Court would be reaching a conclusion that borders on the ridiculous.

The Cape Daisy has advanced a number of arguments denying the existence of a contract between the ship and Captain Roughton. First, the Cape Daisy contends that in light of Captain Roughton's alleged employment status as employee and owner of Independent Docking Pilots, there is no privity of contract between the parties. Related to this contention, the Cape Daisy asserts that a "pilot's exculpatory clause" presented by Captain Roughton on behalf of Independent Docking Pilots should not be integrated into the contract between the Cape Daisy and McAllister or TMR.

The Court rejects this argument because the employment status of Captain Roughton is irrelevant to a determination as to whether a contract was formed. Under the facts presented here, the Court must take into account the established and well-understood manner in which shipowners bargain through their agent for docking pilot services at the DTA terminal. In truth, the Cape Daisy's agent is well aware that when he places a call to a tug company at the DTA pier, the tug company will contact a docking pilot to serve aboard the Cape Daisy. Based on prior dealing, the Cape Daisy's agent fully acknowledges and accepts that the docking pilot chosen by the tug company will tender a pilot's ticket to the ship's Master exempting the pilot from liability and understands that the pilot will not be liable for negligence.

■ The Cape Daisy next argues that the "pilot's exculpatory clause" may not be considered a contract or part of a contract since the pilot's ticket was presented after pilotage services had been rendered. In that sense, the Cape Daisy urges the Court to consider the pilot's ticket to be a mere receipt for services rendered. *See Gulf Towing Co. v. Steam Tanker AMOCO NEW YORK,* 648 F.2d 242, 245–46 (5th Cir.1981). The Court must reject this argument on similar grounds. In the end, the fact that the Master signed the pilotage ticket after, rather than before the allision is inconsequential. The undisputed facts demonstrate that a docking pilot serving aboard the Cape Daisy ordinarily presents the Master with a pilotage ticket containing the same clause. Under the circumstances, the parties should be bound by the implied terms of their prior course of dealing at the DTA pier.[4]

Finally, the Cape Daisy contends that the language of the "pilot's exculpatory clause" proffered by Captain Roughton is "garbled" and contains a meaningless sentence fragment. The pilot's exculpatory clause appeared as follows:

PILOT NOT TO BE HELD PERSONALLY RESPONSIBLE—The services of the

---

**4.** The Master of the Cape Daisy has testified at deposition that he had not read the pilot's exculpatory clause before endorsing the pilotage ticket. Nevertheless, the undisputed facts of this case show that on multiple occasions preceding the accident, captains of the Cape Daisy have endorsed pilotage tickets containing a "pilot's exculpatory clause". The Cape Daisy should be bound by the implied terms of an agreement based on prior dealings.

pilot while participating in directing the navigation of a vessel from on board such vessel or from elsewhere are accepted on the understanding that *neither the owners nor the operators of a vessel* making use of or having her own propelling power *will assert any personal liability to respond in damages,* including any rights over, *against the pilot* for any damage sustained or caused by the vessel, *even though resulting from the pilot's negligence* [sic]. In respect to the giving of orders to any of the tugs furnished to or engaged in the assisting services and/or in respect to the handling of such vessel; excepting, however, the personal liability or rights over against the pilot for his willful misconduct or gross negligence.

 Apparently, the exculpatory provision should contain a comma after the word "negligence" and not a period. Consequently, the subsequent word after the punctuation mark should not be capitalized. The "pilot's exculpatory clause" is not a model of good grammar. Yet the provision is clear and straightforward and capable of plain understanding. Where, as here, the parties repeatedly bargained for docking pilot services utilizing customary procedures, the Cape Daisy is bound by the implied terms of their preexisting agreement.

 Nonetheless, the Court does agree with Cape Daisy's position that the "pilot's exculpatory clause" tendered by Captain Roughton does not necessarily create a right of indemnity against the Cape Daisy, or a right to the remunerative benefits of Cape Daisy's liability insurance. The well-settled rule is that a party's intention to indemnify another must be clearly expressed. *Dow Chem. Co. v. Tug THOMAS ALLEN,* 349 F.Supp. 1354 (E.D.La.1972). The pilot's exculpatory provision at issue here does not contain the word "indemnify" or any operative words to that effect. There is insufficient information to decide the issue at this time. Genuine issues of material fact still exist as to whether the exculpatory provision is an agreement for indemnification, and whether Defendant Roughton is entitled to the remunerative benefits of Cape Daisy's liability insurance.

## III. Conclusion

Upon the foregoing, the Court finds that Defendant M/V Cape Daisy's motion for summary judgment is DENIED. The Court further finds that Defendant Charles L. Roughton's cross-motion for summary judgment is GRANTED in part. In that respect, by virtue of a "pilot's exculpatory clause", Defendant Roughton is individually relieved of responsibility to Defendants M/V Cape Daisy and Shinken Trading Panama Corporation for ordinary acts of negligence arising from his services as a docking pilot aboard the Cape Daisy on March 28, 1997. The Court reserves judgment as to whether this exculpatory provision created a right of indemnity against Defendant M/V Cape Daisy and a right to the remunerative benefits of the liability insurance held by Defendant M/V Cape Daisy.

The CLERK of COURT is ORDERED to send a copy of this order to all counsel of record for this case.

IT IS SO ORDERED.